## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                             Chapter 11

GREAT LAKES COMNET, INC.                            Case No. 16-00290

                  Debtor.

_____

In re:                                             Chapter 11

COMLINK, L.L.C.                                     Case No. 16-00292

                  Debtor.

_____/         Honorable John T. Gregg

## MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364; (B) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (C) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION; (D) MODIFYING THE AUTOMATIC STAY; AND (E) SCHEDULING A FINAL HEARING

      Great Lakes Comnet, Inc. ("GLC") and Comlink, L.L.C. ("Comlink" and collectively

with GLC, "Debtors"), pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364, Rules 2002,

4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and LBR 4001-2, 4001-3, and

9013, move for the entry of an order, in the form appended to this Motion as Exhibit 1

("Interim Order"),[1] authorizing the Debtors, among other things, to incur post-petition, senior

secured, superpriority indebtedness, and to use cash collateral, on an interim and final basis,

pursuant to a DIP Credit and Security Agreement ("DIP Loan Agreement"), in substantially the

form appended to the Interim Order as Exhibit A, the documents to be executed in connection

---

[1] All capitalized terms used but not defined in this Motion have the meanings ascribed to those terms in the Interim Order. The Debtors are also seeking entry of the Interim Order as a final order, after a final hearing upon further notice and an opportunity to be heard can be held, pursuant to Bankruptcy Rule 4001(c)(1)(C)(2).  That order is referred to as a "Final Order" and, together with the Interim Order, the "DIP Orders").

with the DIP Loan Agreement, and the DIP Orders.  In support of this Motion, (a) the Debtors incorporate (i) the *Declaration of John Summersett In Support Of Chapter 11 Petitions and First Day Motions* ("Summersett Declaration") (Dkt. No. 6); (ii)  the *Declaration of Jason Hill In Support of Debtor-in-Possession Financing* ("Hill Declaration") appended as Exhibit 2 to this Motion; and (iii) the *Declaration of Jeffrey L. Johnston in Support of Debtor-in-Possession Financing* ("Johnston Declaration") appended as Exhibit 3 to this Motion; and (b) the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      On January 25, 2016 ("Petition Date"), each Debtor filed a petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"), thereby commencing these bankruptcy cases ("Bankruptcy Cases").  On that same day, the Debtors filed a motion for an order directing joint administration of the Bankruptcy Cases (Dkt. No. 7), which, at least as of the filing of this Motion, remains pending.

2.      The Debtors are continuing in possession of their property and operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the Bankruptcy Cases is proper under 28 U.S.C. §§ 1408 and 1409.

4.      No committee of holders of unsecured claims has been appointed by the United States Trustee ("Committee").

5.      The principal legal basis for the relief requested in this Motion are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, rules 2002, 4001, and 9014 of the Federal Rules

of Bankruptcy Procedure ("Bankruptcy Rules"), LBR  4001-2, 4001-3, and 9013 ("Local Rules"), and case law.

## FACTUAL BACKGROUND

6.     The factual background relating to the Debtors' businesses and the commencement of these Bankruptcy Cases is set forth in detail in the Summersett Declaration.

### A.     Description of Businesses

7.     GLC, based in East Lansing, Michigan, owns and operates a 6,500 mile fiber network serving the carrier and enterprise sectors in Michigan, with the network extending to Ohio, Indiana, Illinois, Wisconsin, and Minnesota.  GLC's services include transport, dark fiber sales, cloud and datacenter operations, toll resale, toll routes, local switching, tandem switching and SS7.[2]  Its fiber and data center-related customers include Verizon, Spectrum Health, Consumers Energy, Google, and the City of East Lansing.  Its fiber network borders or serves key Michigan markets, such as Detroit, Grand Rapids, Lansing, and Ann Arbor.  GLC provides telecommunications services to telecommunications carrier customers.  GLC provides tandem switching and tandem transport services through its tandem switch located in Westphalia, Michigan.

8.     GLC has two wholly-owned subsidiaries: Comlink and Clinton County Telephone Company ("CCTC").  CCTC serves residential and business customers through its two wholly-owned subsidiaries:  Westphalia Telephone Company ("WTC"), operating across the towns of Westphalia, Portland, St. Johns, and Dewitt, Michigan, serving nearly 850 residential and 75 business customers with voice, data, and video services and Westphalia Broadband, Inc. ("WBI"), offering triple play services with nearly 875 customers, including over 235 business

---

[2] Signaling System 7, or "SS7" for short, refers to the basic services provided to establish and route telephone calls, along with related services (e.g., billing).

customers across the same geographic territory. CCTC, WTC and WBI are non-debtor subsidiaries and affiliates of GLC and are not participants in these bankruptcy cases.

9.      Comlink provides data and communication services, including dedicated ultra-high-speed bandwidth data transmission, Ethernet private line services and virtual private network services, cloud-based and colocation data center services, and data management services to Consumers Energy, several hospital systems, municipalities and state correctional facilities. Comlink owns and operates a portion of GLC's fiber network and the majority of its data center assets, servicing enterprise and carrier customers.

### B.      Description of the Debtors' Pre-Petition Financing Arrangements

10.      GLC, as a borrower, is indebted to CoBank, ACB, a federally chartered instrumentality of the United States ("Prepetition Senior Lender"). The Prepetition Senior Lender has provided GLC with a series of loans and other extensions of credit in the aggregate principal amount, together with accrued and unpaid interest, and fees, costs and other charges outstanding, as of the Petition Date, of approximately $25,165,732.05 ("Prepetition Debt"). The Prepetition Debt is evidenced by an Amended and Restated Master Loan Agreement dated as of August 11, 2011, as subsequently amended and supplemented from time to time (as the same may be further amended, modified, supplemented, extended or restated from time to time, the "Prepetition Financing Agreement"), and the documents executed in connection therewith (such documents, together with the Master Loan Agreement, the "Prepetition Financing Documents").

11.      As collateral security for the Prepetition Debt (and among the Prepetition Financing Documents), GLC executed and delivered to Prepetition Senior Lender (a) the Prepetition Financing Agreement; (b) a CoBank ACB Security Agreement dated as of March 8, 2000, granting Prepetition Senior Lender a first lien on substantially all of GLC's business

assets, including, all rents, profits, and proceeds derived therefrom, which constitute cash collateral within the meaning of sections 363(a) and 363(c)(2) of the Bankruptcy Code ("Cash Collateral");[3] (c) an Amended and Restated Real Estate Mortgage dated as of July 8, 2013, as amended, encumbering real property located in Ingham County, Michigan; (d) a Second Amended and Restated Real Estate Mortgage dated as of January 2, 2012, as amended, encumbering real property located in Ingham and Clinton Counties, Michigan; (e) a Pledge Agreement dated August 1, 2011, pledging 100% of GLC's equity interests in CCTC; and (f) a Membership Interests Pledge Agreement dated as of August 1, 2011, pledging 100% of GLC's membership interests in Comlink.  The assets and other property subject to the Prepetition Financing Documents executed and delivered by GLC to the Prepetition Secured Lender are referred to as "GLC Collateral".

12.    Comlink, as guarantor of the Prepetition Debt, guaranteed the prompt and punctual payment of the Prepetition Debt, pursuant to the terms of the Subsidiary Guarantee of Payment (Continuing) executed as of August 1, 2011 (as amended, "Guarantee" and a Prepetition Financing Document).

13.    As collateral security for the Guarantee, Comlink executed and delivered to the Prepetition Senior Lender the CoBank, ACB Security Agreement dated as of August 11, 2011 (a Prepetition Financing Document), granting Prepetition Senior Lender a first lien on substantially all of its business assets, including, all Cash Collateral.  The assets and other property subject to the Prepetition Financing Documents executed and delivered by Comlink to the Prepetition

---

[3] The legal and factual characterizations of the documents identified in paragraphs 10 through 14 of this Motion are for the convenience of the Court and parties in interest and are subject in all respects to the terms and legal effects of the documents themselves.

Senior Lender are referred to as "Comlink Collateral" and, together with the GLC Collateral, the "Prepetition Collateral").

14.     Since November, 2015, the Debtors and the Prepetition Senior Lender have been operating under the terms of a Forbearance Agreement dated as of November 16, 2015, as amended by a First Amendment to Forbearance Agreement dated as of December 8, 2015 (as amended, the "Forbearance Agreement"), together with other documents executed in connection with the Forbearance Agreement (and among the Prepetition Financing Documents).  Under the Forbearance Agreement, the Prepetition Secured Lender agreed to and has continued to finance the Debtors to enable the Debtors to pursue a sales process and otherwise consider restructuring options.   The term of the forbearance under the Forbearance Agreement has expired and the Prepetition Debt is now due and payable in full.

15.     In addition to the UCC financing statements that have been filed in connection with the liens of the Prepetition Secured Lender in the Prepetition Collateral and the Prepetition Financing Documents, the only other financing statements of record according to a UCC search conducted in the State of Michigan through January 19, 2016 (the "UCC Search")[4] are the following filings: (a) Cisco Systems Capital Corporation (a filing in connection with a master equipment lease); (b) Merit Network, Inc. (record notice of the purchase of specified property); and (c) National Telecommunications and Information Administration, U.S. Department of Commerce (specified equipment held in trust for the benefit of the NTIA Broadband Technology Opportunities Program (BTOP) ("BTOP Equipment") and the Federal Government's retained

---

[4]The Debtors have no reason to believe there are any UCC filings since then, *i.e.*, within the last 5 days. The UCC Search is well in excess of 100 pages and is available on request.

undivided equitable reversionary interest in the BTOP Equipment for the useful life of the BTOP Equipment).[5]

16.     All of the parties identified as secured parties of record in the UCC Search have been provided with notice of the Motion, Interim Hearing and the proposed Interim Order at the addresses provided in their financing statements of record.

**C.     Value of the Prepetition Collateral, Prepetition Lien and Basis for Valuations**

17.     There are no appraisals or projections regarding the value of the Prepetition Collateral (*See* LBR 4001-2(a)).  However, since at least October, 2015, the Debtors have been actively marketing their businesses and assets with the assistance of Media Venture Partners, LLP ("MVP"), an investment bank and financial advisor that specializes in raising debt and equity capital, and the marketing and sale of businesses and assets, in the telecommunications industry.   MVP contacted over 50 potential prospects, 42 of whom signed Non-Disclosure Agreements, and 35 of whom received Confidential Information Memoranda concerning the Debtors' business and assets.  MVP held management presentations with 6 prospects, and 5

---

[5] In order to clarify that the Interim Order and the DIP Financing Documents will not affect the federal interest in the BTOP Equipment, paragraph 33 of the Interim Order expressly provides as follows: The equipment acquired or improved, or to be acquired or approved, in whole or in part, with federal funds under NTIA/BTOP Grant Award ##NT10BIX5570099 (to Bloomingdale Communications, Inc. in which GLC is a sub-recipient) and NT10BIX5570114 (to Merit Network, Inc. in which GLC is a sub-receipt) (identified in financing statements 2014022078-0 and 2014022275-8 filed by the National Telecommunications and Information Administration, U.S. Department of Commerce, "NTIA") (collectively, "BTOP Equipment") is subject to a federal interest of the NTIA during the useful life of such BTOP Equipment and, notwithstanding anything to the contrary in this Interim Order, the DIP Financing Documents or otherwise, including the liens granted to DIP Lender in paragraph 7 hereof or the Adequate Protection Liens granted to Prepetition Senior Lender in paragraph 10 hereof, any lien granted in or against the BTOP Equipment under this Interim Order or the DIP Financing Documents is subordinate to the federal interest in the BTOP Equipment in all respects and is only granted to the extent permitted by applicable law concerning the federal interest.

prospects participated in the stalking horse process by submitting initial indications of interest. *See Hill Declaration* at ¶4.

18.     These marketing efforts have resulted in the Debtors' receipt of a stalking horse offer, in the form of a purchase and sale agreement, for the sale and purchase of substantially all of the assets of both Debtors at a purchase price, including the assumption of certain liabilities, estimated to be approximately $32,600,000.  It is the Debtors' intention to subject this stalking horse offer to higher and better offers through a section 363 sale process to be conducted and facilitated in these Bankruptcy Cases.   The Debtors soon will be filing the proposed stalking-horse sale papers, including a motion to establish sale procedures and other relevant dates, processes and procedures in connection with the stalking horse purchase and sale agreement. Given the timely, extensive, and thorough marketing efforts undertaken over at least the past three months and the fact that the assets to be sold are essentially the same assets that serve as Prepetition Collateral, the Debtors are of the reasoned view that the value of the Prepetition Collateral is no less than $32,600,000, the approximate amount of the stalking horse purchase price, and may be greater if a "higher and better" going concern auction and sale can be conducted within a reasonable period of time.  Consequently, given the purpose of the valuation and the proposed disposition of the Prepetition Collateral (*see*, §506(a) of the Bankruptcy Code), the Debtors suggest that $32,600,000 should be treated as the value of the Prepetition Collateral for purposes of this Motion and the relief sought herein. *See Hill Declaration* at ¶5.

19.     As of the Petition Date, the amount owed by the Debtors under the Prepetition Financing Documents to the Prepetition Senior Lender and secured by the Prepetition Collateral is approximately $25,165,732.05, inclusive of accrued interest, fees, costs, and other amounts chargeable to the Debtors under the Prepetition Financing Documents.

**D.    The Need for Section 364 Credit and the Insufficiency of Cash Collateral Usage Alone**

20.    The Debtors' complete and unrestricted access to its Cash Collateral, if authorized by this Court or by consent of the Prepetition Senior Lender,  would be insufficient to enable the Debtors to operate beyond this week. *See Johnston Declaration* at ¶9.

21.    The Debtors retained AlixPartners as their financial advisors in August, 2015. Since that time, AlixPartners has become very familiar with the financial condition of the Debtors, their operations and their cash flows.  At the Debtors' request, AlixPartners has prepared a 13 week, weekly cash forecast, that begins with this week, the week ended January 29, 2016.  *See Cash Flow Forecast* appended as <u>Exhibit A</u> to the Johnston Declaration ("<u>Cash Flow Forecast</u>").   The Cash Flow Forecast assumes no new debt (other than the incurrence of trade debt in the ordinary course) or equity financing, capital or other liquidity infusion (other than the collection of accounts in the ordinary course), and that the Debtors have unrestricted access to 100% of their existing cash and future cash collections during the period covered by the Cash Flow Forecast.  The Cash Flow Forecast demonstrates that without additional borrowings or capital infusion, the Debtors will have insufficient cash collections and, therefore, insufficient Cash Collateral to operate their businesses beyond this week, the week of January 29, 2016, and will run out of cash well before any sales process could be completed and any section 363 sale closed (at least consistent with any notions of due process or obtaining any necessary regulatory approvals).  *See Johnston Declaration* at ¶¶7 and 8.

23.    As a result, the Debtors would not be able to sustain their business operations solely with the permitted use of Cash Collateral, and require additional liquidity to finance their current operations in the form of the section 364 credit requested in this Motion. *See Johnston Declaration* at ¶10.

E.      **Efforts to Obtain Section 364 Credit on More Favorable Terms**

24.     In September, 2015, MVP was also retained to pursue short term financing,

including debtor-in-possession financing, on behalf of the Debtors.  In that role, MVP contacted

30 financial parties (of the 50 potential prospects) capable of refinancing the Prepetition Debt,

providing debtor-in-possession financing, or both.  MVP received verbal feedback from at least 3

potential lending sources, but none of those potential lending sources would consider providing

debtor-in-possession financing on any basis that did not include the grant of a section 364(d) lien

senior to the lien of the Prepetition Senior Lender in the Prepetition Collateral.  The Prepetition

Senior Lender would not consent to the grant of a section 364(d) lien senior to its own lien.  The

values of the Prepetition Collateral, and the cost and expense, time, and uncertainty of litigation

make any non-consensual, priming debtor-in-possession financing impossible to achieve within a

reasonable period of time. *See Hill Declaration* at ¶¶6 and 7.

25.     The only party with whom MVP had conversations that is willing to make debtor-

in-possession financing available on terms that the Debtors reasonably believe can be satisfied is

the Prepetition Senior Lender, CoBank, ACB (in such capacity, the "DIP Lender"), itself.  The

DIP Lender proposes financing the Debtors' projected cash needs[6] through an anticipated section

363 sale closing date in May, on a priming, first-security and superpriority basis pursuant to the

DIP Loan Agreement and the DIP Orders.  Although this financing would occur under sections

364(d)(1) and 364(c)(2) of the Bankruptcy Code, the Prepetition Debt of the Prepetition Senior

Lender would be primed under section 364(d)(1) of the Bankruptcy Code *with the consent of the*

*Prepetition Senior Lender*.  Neither the priming lien granted under section 364(d)(1) to the DIP

---

[6] The DIP Facility will be used to fund the business operations of both Debtors utilizing a combined cash
Budget.  This is consistent with the manner in which the Debtors have operated historically as described
more fully in the Cash Management Motion (Dkt#   ).

Lender nor the lien granted on property of the estate that is not otherwise subject to a lien under section 364(c)(2) would secure the Prepetition Debt.  In other words, the DIP Facility does not contemplate (a) cross-collateralization; or (b) a "roll-up" of the Prepetition Debt.

26.     As adequate protection for its consent to the priming lien being afforded to the DIP Lender against the Prepetition Collateral under section 364(d)(1), the Prepetition Senior Lender is being granted (a) a junior, additional and replacement lien in the DIP Collateral for any diminution in value of its interest in the Prepetition Collateral pursuant to section 361(2) of the Bankruptcy Code ("Adequate Protection Lien"); and (b) to the extent that the Adequate Protection Lien is insufficient to protect its interest in the Prepetition Collateral, a claim under section 507(b) of the Bankruptcy Code (see LBR 4001-2(a)).   No cash or periodic cash payments under section 361(1) are required as adequate protection of the interest of the Prepetition Senior Lender in the Prepetition Collateral.

27.     As discussed, it would be time consuming, expensive and ultimately futile for the Debtors to attempt to obtain approval for financing senior to the lien of the Prepetition Senior Lender under section 364(d)(1) of the Bankruptcy Code.  The Debtors are unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code, secured debt as described in section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP Lender. See Hill Declaration  at ¶¶8 and 9.  Consequently, the proposed financing is on the best terms under the circumstances.

## RELIEF REQUESTED

28.    By this Motion, the Debtors request entry of interim and final orders (<u>DIP</u>

<u>Orders</u>) authorizing them to borrow money and obtain credit from the DIP Lender under the DIP

Loan Agreement, the documents to be executed in connection therewith, and the DIP Orders (the

"<u>DIP Facility</u>") .  The following are the more salient terms of the proposed DIP Facility and the

proposed Interim Order granting this Motion on an interim basis:

(a)    <u>DIP Facility Commitment.</u>   The maximum principal commitment is $5,500,000 during the term of the financing. *See* Interim Order, ¶¶2 and 3, and DIP Loan Agreement, §2.4.

(b)    <u>Approved Budget.</u>   The Postposition Loans are made in accordance with a weekly Budget prepared by the Debtors and approved by the DIP Lender, plus a cumulative net cash flow variance of no more than $500,000 during the period covered by the Budget. *See* Interim Order, ¶2, and DIP Loan Agreement, §2.12.

(c)    <u>Due Date.</u> The Postpetition Loans mature and are due and payable in full on May 11, 2016, absent the occurrence of an earlier Termination Event or Due Date. *See* Interim Order, ¶¶ 15 and 16, and §14.1 of the DIP Loan Agreement.

(d)    <u>Interest Rate.</u> The non-default interest rate is the prime rate plus 6.5% per annum, and the default interest rate is 5% per annum higher. *See* Interim Order, ¶5, and DIP Loan Agreement §3.1.

(e)    <u>Termination Events.</u>   Each of the following is a Termination Event, the occurrence of which, together with notice, causes a cessation of further borrowings and, five (5) business days after notice, with limited specified exceptions, the right to use Cash Collateral:

i.    Debtors shall fail to pay any Postpetition Loans in cash after such payment has become due;

ii.    Any report, certificate or other document delivered to the DIP Lender pursuant to the DIP Financing Documents, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;

iii. The failure of the Debtors to comply in all material respects with any covenant, agreement or terms and conditions of the Interim Order, the Final Order and the DIP Financing Documents;

iv. Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive business days;

v. Any material damage to, or material loss, theft or destruction of, any DIP Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, in each case, for more than three (3) consecutive business days, the cessation or substantial curtailment of revenue producing activities at any facility of the Debtors, if any such event or circumstance could reasonably be expected to have a material adverse effect on the DIP Collateral;

vi. The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the DIP Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the DIP Lender in its sole discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the DIP Lender, provided, however, that any terms in the Final Order consented to by DIP Lender in its sole discretion that are different from the Interim Order shall not constitute an Event of Default;

vii. The conversion of any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

viii. The appointment of a trustee for the Debtors;

ix. The dismissal of any Bankruptcy Case; provided that the DIP Lender has not consented in writing to such dismissal;

x. The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (i) realize upon, or to exercise any right or remedy with respect to, any material portion of the DIP Collateral, or (ii) to terminate any license, franchise or similar agreement, where, in each case, the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material adverse effect on the DIP Collateral;

xi. Subject to the allowance and payment of any amounts due under the Carve-Out, the filing of any application by the Debtors without the express written consent of the DIP Lender for the approval of a super-priority claim in the Bankruptcy Cases which is pari passu with or senior to the priority of the claims of the DIP Lender, or there shall arise any such super-priority claim under the Bankruptcy Code;

13

xii.     Except for payments authorized by order of the Court pursuant to a motion or other application filed prior to the entry of the Final Order or pursuant to the Budget (subject to the Permitted Variance), the payment or other discharge by the Debtors of any prepetition indebtedness without the written consent of the DIP Lender;

xiii.    The filing of any motion by the Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing (other than ordinary course trade debt or unsecured debt afforded priority under section 503(b) of the Bankruptcy Code) for any of the Debtors from any person other than the DIP Lender (unless the proceeds of such financing are to be used to pay in full in cash all Postpetition Loans and other obligations arising under the DIP Financing Documents, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the DIP Collateral, other than with respect to the DIP Financing Documents (unless such liens are granted in connection with a financing, the proceeds of which are to be applied to the payment in full in cash of Postpetition Loans and other obligations arising under the DIP Financing Documents, the Interim Order and the Final Order, and other than liens granted as adequate protection for prepetition liens on the Debtors' assets, which adequate protection liens are junior in priority to the DIP Lender's super priority priming liens); (c) except as permitted by the DIP Financing Documents, the Interim Order or the Final Order or without the prior written consent of DIP Lender, (i) permitting the use of any of the DIP Collateral pursuant to Bankruptcy Code § 363(c), or (ii) permitting recovery from any portion of the DIP Collateral of any costs or expenses of preserving or disposing of such DIP Collateral under Bankruptcy Code § 506(c);

xiv.     The filing of a motion or other pleading by the Debtors seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all Postpetition Loans and other obligations under the DIP Financing Documents, the Interim Order and the Final Order on the consummation date of such plan of reorganization, and as to which the DIP Lender has not consented in writing;

xv.      If any of the DIP Financing Documents, Prepetition Financing Documents, DIP Loan or Prepetition Debt shall be cancelled, terminated, revoked or rescinded; or the DIP Lender's or Prepetition Senior Lender's lien on any of the DIP Collateral or Prepetition Collateral shall cease to be perfected or have the priority contemplated by the DIP Financing Documents and Prepetition Financing Documents (as modified by the Interim Order or Final Order); or any motion, suit, action at law or in equity, or any other legal proceeding to cancel, revoke, rescind or otherwise challenge the DIP Financing Documents, Prepetition Financing Documents or the DIP Lender's or Prepetition Senior Lender's lien on any of the DIP Collateral or Prepetition Collateral is commenced by the Debtors; or any portion of the Interim Order or Final Order is determined to be null and void, invalid or unenforceable by the Court or

14

another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Bankruptcy Cases;

xvi.    The Debtors shall fail to file a motion seeking approval of sale and bidding procedures for the sale of substantially all of the Debtors' assets by January 27, 2016;

xvii.    The Debtors shall fail to receive Court approval of the sale and bidding procedures for the sale of substantially all of the Debtors' assets by February 22, 2016;

xviii.    The Debtors shall fail to hold the auction for substantially all of the Debtors' assets by March 7, 2016;

xix.    The Debtors shall fail to receive Court approval for the sale of substantially all of Debtors' assets by March 14, 2016;

xx.    The failure to appoint a Chief Restructuring Officer mutually acceptable to the DIP Lender and the Debtors and approved by the Court, with the authority of the highest ranking corporate officer responsible for all final decision making on behalf of the Debtors by March 14, 2016; or

xxi.    The Debtors shall fail to consummate the sale of substantially all of the Debtors' assets by May 11, 2016.

*See* Interim Order, ¶15, and DIP Loan Agreement, §10.

(e)    <u>DIP Liens and Superpriority Claims.</u>  The Postpetition Loans are secured by a senior first-priority lien on all of the Debtors' interests in all encumbered property pursuant to section 364(d)(1), and, except for avoidance actions and any recoveries (which are expressly excluded), all unencumbered property pursuant to section 364(c)(2), and a superpriority administrative expense claim pursuant to section 364(c)(1). These liens and superpriority claims are subject to the Carve-Out described below and, to the extent applicable, the federal interest.[7] *See* Interim Order, ¶¶7 and 9, and DIP Loan Agreement, §§4.4 and 4.5.

(f)    <u>Adequate Protection Liens and Section 507(b) Claims.</u>  The liens of the Prepetition Senior Lender in the Prepetition Collateral that are being primed under section 364(d)(1) with its consent are being adequately protected by the grant of a junior, additional and replacement lien against the DIP Collateral to secure any diminution of the Prepetition Senior Lender's interest in the Prepetition Collateral and, to the extent that is inadequate, an administrative expense claim of the priority afforded by section 507(b) of the Bankruptcy Code. *See* Interim Order, ¶10.

---

[7] *See* footnote 5 above.

(g)     <u>Cash Collateral</u>.  The Debtors' are authorized to use Cash Collateral in the ordinary course of business to pay amounts in accordance with the Budget, plus any permitted variance.  *See* Interim Order, ¶2.

(h)     <u>Automatic Perfection</u>.  The liens in the DIP Collateral are deemed automatically perfected without further notice, filing or other act required for perfection.  The DIP Lender may, but need not, require compliance with public filing and related requirements.  *See* Interim Order, ¶22.

(i)     <u>Carve-Out.</u>  There is a limited carve-out that is senior to the DIP Liens and superpriority claims of the DIP Lender for unpaid fees of the Clerk of the Court and US Trustee, professional fees and expense incurred by estate professionals; success fees in connection with a section 363 sale of substantially all of the Debtors' assets; administrative expenses incurred after such a sale; and fees and expenses of a chapter 7 trustee. *See* Interim Order, ¶8.

(j)     <u>Section 506(c) Waiver.</u>  Except for the Carve-Out, rights under section 506(c) to surcharge the DIP Collateral are waived. *See* Interim Order, ¶¶ 6 and 11.

(k)     <u>Other Waivers</u>. There are a number of other waivers of rights, including, but not limited to, seeking or obtaining senior or equal secured or administrative expense financing, a section 506(c) surcharge, or nonconsensual use of cash collateral, or attacking the validity, priority or extent of any postpetition liens of the DIP Lender, or bringing litigation against the DIP Lender. *See* Interim Order, ¶¶11 and 13.

(l)     <u>Relief from Automatic Stay.</u> The automatic stay provisions of Section 362 of the Bankruptcy Code are modified to the extent necessary to permit all acts, actions and transfers, relating to perfection of interests contemplated therein. During the term of the DIP Facility contemplated by the Interim Order, the DIP Lender may file a motion seeking to lift the automatic stay in the event of a Termination Event, but no automatic stay modification is provided for. *See* Interim Order, ¶¶14 and 15, and DIP Loan Agreement, §11.

(m)     <u>Borrowing Conditions</u>.  The Postpetition Loans are available at the request of the Debtor to fund the Budget plus the permitted variance.  At the time of each draw, the representations and warranties in the DIP Loan Agreement shall be true, no Termination Event shall have occurred or result from the Postpetition Loan, and the total outstanding Postpetition Loans after giving effect to the draw cannot exceed the maximum availability.  *See* Interim Order, ¶2, and DIP Loan Agreement, §8.2.

(n)　　Indemnity.  The Debtors give the DIP Lender and its officers, directors and others a broad indemnity from liability to others in the Bankruptcy Cases and otherwise.  *See* DIP Loan Agreement, § 15.5.

(o)　　Interim Hearing.  Under Bankruptcy Rule 4001, an interim hearing is requested to be held before this Court to consider entry of the Interim Order approving the DIP Facility on an interim basis and authorizing the Debtors to obtain, on an interim basis, under the DIP Facility, a sum not to exceed $3,850,00 for the next 45 days, pursuant to the terms and conditions of the Interim Order,[8] and further requesting the Court to set a final hearing on this Motion (the "Final Hearing") and establish notice procedures for the Final Hearing, wherein the Court will consider entry of the Final Order authorizing the DIP Facility.  *See* Interim Order, ¶¶4 and 31.

(p)　　Section 364(e) Good Faith Protection.   The terms of the Interim Order and the rights afforded thereunder are protected from reversal or modification on appeal of the Interim Order.  *See* Interim Order, ¶¶K, 28 and 30.[9]

## AUTHORITIES AND ARGUMENT

**A.　　Debtor-in-Possession Financing**

　　**i.　　Senior Lien on Prepetition Collateral of Prepetition Senior Lender**

29.　　Section 364(d) of the Bankruptcy Code provides that a debtor may obtain post-petition financing by granting a lien on property of the estate that is senior or equal to liens that already exist on such property, so long as the debtor provides adequate protection of the previous lienholders' interest in such property.  Section 364(d) of the Bankruptcy Code provides:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

---

[8] To the extent there is a conflict between the DIP Loan Agreement and the Interim Order, the Interim Order shall control.

[9] All of the terms summarized above are proposed to remain in effect if interim approval is granted, but final relief is denied.  In addition, none of the provisions in Bankruptcy Rule 4001(c)(1)(B)(iii), (v)(except as set forth above concerning the right to request cash collateral under section 363 or credit under 364), (vi), (viii), or (xi) is addressed in the DIP Loan Agreement or the Interim Order.

        (A)     the trustee is unable to obtain such credit otherwise; and

        (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

30.     The Debtors satisfy the requirements of section 364(d) of the Bankruptcy Code because (a) the Debtors are unable to obtain credit otherwise or on terms more favorable to their bankruptcy estates, (b) the Prepetition Senior Lender is adequately protected and consents to a section 364(d) priming lien, and (c) the proposed DIP Facility is in the best interest of the bankruptcy estates. The Debtors seek to grant a senior lien upon the Prepetition Collateral of the Prepetition Senior Lender, subject to the Carve-Out.  The Prepetition Senior Lender has consented to the priming lien being given to the DIP Lender as collateral security for the DIP Facility.

31.     In the Debtors' business judgment, the DIP Facility represents the best financing option to effectuate the purposes and advance the Debtors' reorganization efforts in implementing and consummating a section 363 sale in order to maximize value to the estate.

32.     The superpriority claims and the liens, including the Priming Lien, granted to the DIP Lender under the Interim Order will be subject to the Carve-Out described in paragraph 8 of the Interim Order. The Carve-Out will ensure that the Debtors and the Committee are able to continue with the assistance of counsel, thereby promoting the collective rights and expectations of parties-in-interest.

33.     Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize similar

lender incentives that extend beyond the specific liens and rights specified in section 364 of the

Bankruptcy Code and those proposed to be granted to the DIP Lender in the Interim Order.

### ii.    Additional and Replacement Lien as Adequate Protection

34.    In addition, as adequate protection, the Prepetition Senior Lender is consenting to

the DIP Lender's Priming Lien on the Prepetition Collateral and, in exchange, is receiving the

Adequate Protection Lien.  The Adequate Protection Lien being granted to the Prepetition Senior

Lender is (a) subject and subordinate to the Priming Lien and the other liens granted to secure

the Postpetition Loans in the DIP Collateral and the superpriority claims granted to the DIP

Lender, (b) subject and subordinate to the Carve-Out, and (c) not secured by, or repayable from,

Avoidance Actions and Recoveries.

35.    Pursuant to Section 361(2) of the Bankruptcy Code, a debtor may, in the exercise

of its business judgment, provide an additional or replacement lien to the extent that a stay, use,

sale, lease or grant results in a decrease in the value of such entity's interest in property, as a

permissible form of adequate protection.   The Adequate Protection Lien satisfies the

requirements of section 361(2) of the Bankruptcy Code.

36.    Having determined that financing was available only under Sections 364(d) of the

Bankruptcy Code, the Debtors negotiated the DIP Facility at arm's-length and pursuant to their

business judgment, which is to be accorded great weight so long as it does not run afoul of the

provision of and policies underlying the Bankruptcy Code. *See, e.g., Bray v. Shenandoah*

*Federal Say. & Loan Assn (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986)(approving

debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dep't Stores,*

115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)(with respect to post-petition credit, courts "permit

debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

37.     In satisfying the standards of Section 364(d) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code. *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986)("the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.,* 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require [d]ebtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances.  The Debtors' efforts described elsewhere in this Motion, and particularly in paragraphs 24 and 25 hereof and in the *Hill Declaration* at ¶¶6 and 7, more than satisfy the standard that has been established in the case law.

38.     The DIP Facility is clearly for the benefit of the Debtors' bankruptcy estates and creditors. The DIP Facility is critical to maintaining the Debtors' operations and, thus, preserving and enhancing the Debtors' going concern value. As evidenced by the Budget and the Cash Flow Forecast, use of Cash Collateral alone is insufficient to pay even the normal operating expenses of the Debtors. *See* the *Johnston Declaration.*  With the additional liquidity provided by the DIP Facility, the Debtors will be able to maintain ongoing operations, thereby permitting them to

generate revenues, pay their employees, and operate their businesses for the benefit of all parties-in-interest while pursuing an orderly section 363 sales process.

39. The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's-length. Accordingly, the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the DIP Facility.

### B. The Interim Approval Should Be Granted

40. Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to section 364 may not be commenced earlier than 14 days after service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize obtaining credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

41. On an interim basis, the Debtors request that this Court authorize the Debtors to borrow and use up to $3,850,000 during the next 45 days. This amount anticipates a final hearing on the Motion within 45 days of the entry of the Interim Order and that the Court approves the financing on the terms requested in the Interim Order. *See Johnston Declaration* at ¶11. The Debtors must have the interim relief requested in the Interim Order to maintain and operate their businesses. Absent such relief, the Debtors will be unable to meet their payroll obligations or to preserve and protect their assets and the value of those assets, and operations will cease. *See Johnston Declaration*, ¶12. The Debtors have inadequate cash collateral to operate and pay necessary expenses of the Bankruptcy Cases and to move forward with a sale process, absent the proposed DIP Facility being approved on an interim expedited basis. *See Johnston Declaration* at ¶¶7-10. As a result, the Debtors need the DIP Facility and the amount

requested on an interim basis to avoid immediate and irreparable harm to the Debtors'

bankruptcy estates until a final hearing can be held.  Absent access to the DIP Facility, the

Debtors' businesses will simply shut down and their employees will have to be terminated.  *See*

*Johnston Declaration* at ¶12. In addition, the services provided by the Debtors to their customers

can be provided by no other entity in the short term and according to Federal Communications

Commission regulations must be provided by the Debtors pending approval of another regulated

entity.

42.    The Debtors request, pursuant to Bankruptcy Rule 4001(c), that the Court

authorize the Debtors, from and after the entry of the Interim Order, until an order is entered

following the Final Hearing on the Motion, to obtain credit under the DIP Facility. This will

enable the Debtors to maintain ongoing operations and the means by which they may avoid

immediate and irreparable harm and prejudice to their bankruptcy estates, all parties-in-interest

and the Debtors' customers, pending the Final Hearing.

## NOTICE

### C.    Notice With Respect to Interim Hearing on the Motion

43.    Notice of this Motion, the interim hearing and the relief proposed to be granted in

the Interim Order has been provided (by hand, fax, overnight mail, email or courier) to counsel

to the Prepetition Senior Lender, the United States Trustee, the creditors included on the list filed

under Bankruptcy Rule 1007(d),[10] counsel to DIP Lender, all creditors believed to have an

interest in Cash Collateral, all parties who filed requests for notice pursuant to Bankruptcy Rule

2002, all parties appearing of record in the UCC Search, and all governmental agencies having

taxing authority over the Debtors.  The Debtors submit that, under the circumstances, no further

---

[10] A Committee will not yet have been appointed at the time of service of the Motion.

notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

### D.    Notice With Respect to Final Hearing on the Motion

44.    The Debtors respectfully request that the Court set a final hearing date on the Motion for  **a date within 45 days after entry of the Interim Order,** and authorize the Debtors to serve a copy of this Motion and the Interim Order which fixes the time and date for filing objections to this Motion, by first class mail upon (a ) counsel to the Committee, if any; (b) the creditors included on the list filed under Rule 1007(d); (c) the Office of the United States Trustee; (d) counsel to the Prepetition Senior Lender; (e) counsel to the DIP Lender; (f) all parties appearing of record in the UCC Search or otherwise known to the Debtors to have or assert liens on or security interests in any of the Debtors' assets; (g) the Internal Revenue Service; (h) all governmental agencies having taxing authority over the Debtors, and (i) all parties who have timely filed requests for notice under Bankruptcy Rule 2002. The Debtors request that the Court deem such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

### PRAYER

**WHEREFORE**, the Debtors respectfully request that the Court (a) enter the Interim Order, in the form appended as <u>Exhibit 1</u>, which, among other relief, (i) authorizes the Debtors to enter into and perform the DIP Loan Agreement and the DIP Financing Documents to be executed in connection therewith; (ii) authorizes, on an interim basis, the Debtors' to borrow up to $3,850,000 under the DIP Facility from the DIP Lender on a senior secured and superpriority, administrative expense claim basis, including the grant of liens

23

under sections 364(c)(2) and(d)(1) and a superpriority administrative expense claim under

section 364(c)(1); (iii) authorizes and approves the Adequate Protection Liens and

Prepetition Debt Priority Claims of the Prepetition Senior Lender; and (iv) establishes notice

procedures and schedules the Final Hearing on this Motion for approval of the DIP Facility;

and (b) grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By:  /s/ Stephen S. LaPlante
       Jonathan S. Green (P33140)
       Stephen S. LaPlante (P48063)
       Attorneys for the Debtors
       150 West Jefferson, Suite 2500
       Detroit, MI  48226
       (313) 496-7997
       (313) 496-8478
       green@millercanfield.com
       laplante@millercanfield.com

       *Proposed Attorneys to the Debtors and*
       *Debtors in Possession*

Dated:  January 25, 2016

25630948.13\130050-00009
1/25/16

24