# *EXHIBIT 1*

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN
-----------------------------------------------------------------x

In re                                                    Chapter 11

GREAT LAKES COMNET, INC., *et al.*[1]                     Case No. 16-00290

Debtors.                                   (Jointly Administered)
-----------------------------------------------------------------x

**INTERIM ORDER (A) AUTHORIZING DEBTORS IN POSSESSION TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364; (B) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (C) AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION; (D) MODIFYING THE AUTOMATIC STAY; AND (E) SCHEDULING A FINAL HEARING**

Upon the motion (the "<u>Motion</u>") of Great Lakes Comnet, Inc. ("<u>GLC</u>") and Comlink, L.L.C. ("<u>Comlink</u>"), as debtors and debtors in possession (each, a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") for entry of an interim order (the "<u>Interim Order</u>") pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and LBR 4001-2, 4001-3, and 9013 seeking, among other things:

(i)     authorization to obtain credit and incur debt pursuant to sections 105, 362, 363 and 364 of the Bankruptcy Code in accordance with the DIP Credit and Security Agreement attached hereto as <u>Exhibit A</u> (the "<u>DIP Loan Agreement</u>", the Note referred to therein ("<u>DIP Note</u>", together with the DIP Loan Agreement, this Interim Order and the Final Order, the "<u>DIP Financing Documents</u>"), among the Debtors and CoBank, ACB (in such capacity, the "<u>DIP Lender</u>"), subject to the terms and conditions set forth herein;

(ii)    authorization to grant first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code) and superpriority claims to the

---

[1] The Debtors in these Bankruptcy Cases are Great Lakes Comnet, Inc., case no. 16-00290, and Comlink, L.L.C., case no. 16-0092.  On January [  ], 2016, the Court entered an Order Directing the Joint Administration of Their Bankruptcy Cases [Dkt. No.   ].

DIP Lender, except to the extent provided herein, against all property of the Debtors' estates, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, and, except to the extent provided herein, with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code;

(iii)  use "cash collateral" as the term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") and, pursuant to sections 361 and 363 of the Bankruptcy Code, grant security interests, mortgages and other liens and superpriority claims in order to provide adequate protection to the Prepetition Senior Lender (as hereinafter defined);

(iv)  modification of the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to implement the terms and provisions of the DIP Financing Documents and this Interim Order; and

(v)  scheduling of a final hearing for entry of an order granting the relief requested in the Motion on a final basis (the "Final Order") and approving the form of notice with respect to the Final Hearing (as hereinafter defined) pursuant to Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

This Court having reviewed the Motion, all matters brought to the Court's attention at the preliminary hearing on the Motion held on January 27, 2016, pursuant to Rule 4001 (the "Interim Hearing"), including the (i) the Declaration of John Summersett In Support Of Chapter 11 Petitions and First Day Motions (Dkt. No. 6); (ii) the Declaration of Jason Hill In Support of Debtor-in-Possession Financing (Exhibit B to Dkt. No . ); and (iii) the Declaration of Jeffrey L. Johnston in Support of Debtor-in-Possession Financing (Exhibit C to Dkt. No. ), the record of which is incorporated herein, and all objections to the Motion and relief granted herein; and after due deliberation and consideration, the Court makes the following findings of fact and

conclusions of law (to the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*).

**THE COURT HEREBY FINDS:**

A.     On January 25, 2016 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing these jointly administered bankruptcy cases (the "<u>Bankruptcy Cases</u>").  The Debtors are now operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  There is no pending request or motion for the appointment of a trustee or examiner. An official committee of holders of unsecured claims (the "<u>Committee</u>") has not been appointed by the United States Trustee.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. § 1408.

C.     Pursuant to (i) the Amended and Restated Master Loan Agreement, dated as of August 1, 2011 (as amended, modified or supplemented, the "<u>Prepetition Financing Agreement</u>"), by and between GLC, as borrower, and CoBank ACB, as lender (in such capacity, the "<u>Prepetition Senior Lender</u>"), and related agreements and documents, including a Subsidiary Guarantee of Payment (Continuing), dated as of August 1, 2011, executed by the Comlink, as guarantor (collectively, with the Prepetition Financing Agreement, the "<u>Prepetition Financing Documents</u>"), the Prepetition Senior Lender has made certain loans and other financial accommodations to or for the benefit of the Debtors.  As of the Petition Date, the aggregate amount of approximately $25,165,732.05 was due and owing in respect of principal, accrued and unpaid interest, and fees, costs and other charges owed under the Prepetition Financing Documents (together with any other fees and expenses incurred in connection with the

3

Prepetition Financing Documents, and all other obligations of the Debtors thereunder, the "Prepetition Debt").

D.      To secure the Prepetition Debt and pursuant to the Prepetition Financing Documents, the Debtors granted to the Prepetition Senior Lender security interests in the real and personal property (tangible and intangible) fully described and set forth in the Prepetition Financing Documents, the "Prepetition Collateral," and such security interests shall be referred to herein as the "Prepetition Lender's Liens").

E.      In addition to any Cash Collateral that may be available to the Debtors, an immediate and critical need exists for the Debtors to obtain additional financing in order to continue their businesses without interruption. Unrestricted Cash Collateral usage alone is insufficient to enable the Debtors to continue to operate. Without such additional financing, the Debtors will not be able to meet their payroll, pay other direct operating expenses, or obtain goods and services needed to carry on their businesses during this sensitive period in a manner that will avoid irreparable harm to the Debtors' estates, creditors, customers, and employees. Nor will the Debtors be able to reasonably and cost-effectively market and sell their businesses and/or assets as going concerns. At this time, the Debtors' ability to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the confidence of the Debtors' vendors and suppliers, to their customers, and to the preservation and maintenance of the going concern value of the Debtors' estates. The Debtors are unable to obtain the required financing in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1), secured debt as described in

section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by DIP Lender.

F.      All of the Debtors' assets (other than the assets described as "excepted property" or "deleted" in the financing statements and amendments of record filed by Prepetition Senior Lender before the Petition Date) are subject to the Prepetition Lender's Liens.  The Prepetition Senior Lender agrees that it is adequately protected pursuant to the provisions of this Interim Order in satisfaction of section 364(d)(2) of the Bankruptcy Code.  Nothing herein is intended or shall be deemed to be a determination with respect to the validity, enforceability, perfection, priority or avoidability of the Prepetition Lender's Liens.

G.      Subject to the provisions of the DIP Loan Agreement, the DIP Lender has agreed to provide postpetition financing to and for the benefit of the Debtors to be used for (i) the Debtors' general working capital and operational expenses, (ii) administration of the Bankruptcy Cases (in each case of (i) and (ii), in accordance with a weekly cash flow budget prepared by the Debtors, in form and substance acceptable to the DIP Lender), and (iii) costs, expenses, closing payments, and other payment amounts contemplated in the DIP Loan Agreement.

H.      Due and appropriate notice of the Interim Hearing and the relief granted herein has been provided (by hand, fax, overnight mail, email or courier) to (i) counsel to the Prepetition Senior Lender, (ii) the United States Trustee, (iii) the creditors included on the list filed under Bankruptcy Rule 1007(d), (iv) counsel to DIP Lender, (v) all parties identified in financing statements appearing of record with the State of Michigan as of January 19, 2016, or otherwise known to the Debtors to have or assert liens on or security interests in any of the Debtors' assets, (vi) all parties who filed requests for notice pursuant to Bankruptcy Rule 2002, and (vii) all governmental agencies having taxing authority over the Debtors.  In view of the urgency of the relief requested, such notice constitutes sufficient notice under Bankruptcy Rule

5

4001 and no other notice of the Motion or the interim relief granted herein need be given, except as expressly provided herein in connection with the Final Hearing (defined below).

I.         Good cause has been shown for the entry of this Interim Order.  Among other things, entry of this Interim Order will minimize disruption of the Debtors' businesses and operations and permit them to meet payroll for their approximately fifty-seven employees and other operating expenses, obtain needed goods and services and retain customer and supplier confidence by demonstrating an ability to maintain normal operations pending the prompt completion of a going concern sale process.  The financing arrangements authorized hereunder are vital to avoid immediate and irreparable harm to the Debtors' estates.  Consummation of such financing therefore is in the best interests of the Debtors' estates.

J.         Each Debtor is a duly organized, validly existing entity, and each Debtor has the requisite power and authority to own, lease, and operate its property, including, without limitation, the DIP Collateral.  Subject to the entry of this Interim Order, each Debtor has the requisite power and authority to enter into, execute, deliver, and perform its obligations under the terms of the DIP Financing Documents and to incur the obligations provided for therein.  Upon entry of this Interim Order, the DIP Financing Documents shall constitute the valid and legally binding obligations of each Debtor, enforceable against each Debtor in accordance with their terms.  Except for the entry by the Court of this Interim Order, no consent or waiver of, filing with, authorization, approval or other action by any shareholder, any federal, state or other governmental authority or regulatory body or any other Person, which has not already been obtained or done, is required in connection with the execution, delivery and performance by any Debtor of any of the documents required as a condition to the validity or enforceability of the DIP Financing Documents.

6

K.     The financing authorized hereunder has been negotiated in good faith and at arm's length. The terms of such financing are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  Any credit extended and loans made to the Debtors pursuant to this Interim Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code, and the DIP Lender and Prepetition Senior Lender shall have all of the protections thereunder.

L.     The DIP Lender and the Prepetition Senior Lender have consented to the terms of this Interim Order and its continuation as a Final Order.

**THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.     The Motion is granted on an interim basis and on the terms set forth herein.  Any objections to the Motion with respect to the entry of this Interim Order that have not previously been withdrawn or resolved are hereby denied and overruled.

2.     The Debtors are hereby authorized to (a) borrow money and otherwise obtain credit pursuant to the credit facility (the "DIP Facility") set forth in the DIP Financing Documents, including the DIP Loan Agreement, and this Interim Order (all loans, advances and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtors to the DIP Lender under the DIP Financing Documents, the "Postpetition Loans"), and (b) perform their obligations hereunder and thereunder (i) in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Documents, and (ii) in compliance with, and for the purposes of funding those expenses set forth in, the budget attached as Exhibit B to this Interim Order (as may be modified or supplemented from time to time with the prior written consent of the DIP Lender without the need for further

order of this Court; provided that such modifications or supplements (x) are not material in the good faith belief of the Debtors and DIP Lender, or (y) are additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which the DIP Lender and the Debtors agree after counsel for any Committee that has been appointed in these Bankruptcy Cases has been given three (3) business days' notice to object and request a hearing, the "Budget").  The determination of compliance with the Budget shall be made on a week-ending basis for each week until the occurrence of a Termination Event (defined in paragraph 15).  The Debtors shall be in compliance with the Budget so long as the difference between (a) actual total cash receipts (exclusive of borrowings of Postpetition Loans and cash on hand immediately prior to the Petition Date) and (b) actual total cash disbursements for the cumulative period beginning on and continuing after the Petition Date ("Net Cash Flow") does not vary unfavorably by more than $500,000 from the Projected Net Cash Flow set forth on the line of the Budget entitled "Cumulative Net Cash Flows Before DIP Financing" for the same period ("Permitted Variance").  The Debtors are authorized to enter into amendments, modifications and supplements to the Budget, and what they in good faith believe are non-material amendments, modifications and supplements to the DIP Financing Documents without further Court order as may be agreed upon in writing by the Debtors and the DIP Lender after consulting with counsel for the Committee, if any.  Notwithstanding any other provision of this Interim Order, the DIP Lender shall not have any obligation or commitment to make any Postpetition Loans pursuant to this Interim Order if the conditions precedent provided for herein have not been satisfied.  The Debtors are authorized to use Cash Collateral of the DIP Lender and Prepetition Senior Lender in the ordinary course of their businesses to pay amounts in accordance with the Budget (plus any Permitted Variance).

8

3.     The Debtors are hereby authorized to borrow up to an aggregate principal amount of $5,500,000 pursuant to the DIP Financing Documents on a weekly basis in accordance with the Budget (which includes the Permitted Variance).  Absent further order of the Court, borrowings under this Interim Order prior to entry of the Final Order shall not exceed the cash needs set forth in the Budget, plus the Permitted Variance, through the Final Hearing (defined below) for entry of the Final Order ("Interim Cap").

4.     Prior to entry of the Final Order, the DIP Financing Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lender.  Upon entry of the Final Order, the DIP Lender shall make advances to the Debtors as provided in the Final Order, the DIP Financing Documents and the Budget.  Notwithstanding any other provision of this Interim Order or the DIP Financing Documents, the DIP Lender shall be under no obligation to fund the Postpetition Loans, for any purpose, in an amount greater than the Interim Cap until entry of the Final Order.

5.     The Postpetition Loans shall bear interest at the applicable rates (including default and non-default interest rates) set forth in the DIP Financing Documents.  The DIP Lender shall be paid all interest, fees, costs and expenses as set forth in the DIP Financing Documents. Neither of the Debtors nor the DIP Lender shall be obligated to file any application with the Court for approval or payment of the costs and expenses, subject to review by the United States Trustee and, if appointed, the Committee, with respect to reasonableness upon ten (10) days' prior notice before payment.  Upon payment, such costs and expenses shall be deemed fully earned, indefeasibly paid, and non-refundable.  All such costs, fees, charges, and expenses shall be part of the Postpetition Loans (and are in addition to the amounts authorized in paragraph 3 above), and shall have the same rights, status, and priority as the Postpetition Loans.

9

6.      Except for the Carve-Out, as further consideration for the Postpetition Loans, no other costs or administrative expenses, pursuant to sections 506(c) and/or 105(a) of the Bankruptcy Code or otherwise, that have been or may be incurred in these chapter 11 cases, in any proceedings related hereto or in any subsequent chapter 7 cases, and no priority claims are or will be prior to or on parity with the superpriority claims of the DIP Lender.  Except as expressly provided in the case of the Carve-Out, in no event shall any such costs or expenses of administration be imposed upon any of the DIP Collateral without the prior written consent of the DIP Lender, and no such consent shall be implied from any action, inaction, or acquiescence. The DIP Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

7.      As security for the Postpetition Loans, the DIP Lender is hereby granted pursuant to sections 364(d)(1) and 364(c)(2) of the Bankruptcy Code, (i) a perfected first priority priming lien (the "Priming Lien") on any and all current and future assets of the Debtors of any nature or type whatsoever, including, without limitation, cash, accounts, accounts receivable, goods, instruments, investment property (including, without limitation, ownership interests in corporations, partnerships and limited liability companies), inventory, vehicles, customer lists, trademarks, copyrights, brands, know-how and other intellectual property, minerals, mineral rights, plant and equipment, patents, trade secrets, tax assets, real property and/or leasehold rights, personal property, any causes of action under the Bankruptcy Code or applicable non-bankruptcy law, and all other tangible and intangible assets, and any and all proceeds of the foregoing, but specifically excluding causes of action and recoveries or proceeds pursuant to chapter 5 of the Bankruptcy Code ("Avoidance Actions and Recoveries"); (ii) a first priority pledge of the shares, limited liability company interests, capital stock and/or equity interests held directly by each of the Debtors (x) that have not previously been pledged to third parties other

10

than the Prepetition Senior Lender, and (y) exclusive of shares or equity that GLC owns or otherwise holds in the DIP Lender; and (iii) constructive control over all of the Debtors' bank accounts in similar form and substance of lockbox and/or control accounts customary for transactions of this nature exercisable upon an Event of Default (as hereinafter defined) and stay relief from the Court having first been obtained, or as may be provided in the Interim Order and Final Order, for the purposes of constituting perfection under applicable non-bankruptcy law (collectively, but exclusive of Avoidance Actions and Recoveries, the "DIP Collateral").  The Priming Lien shall (a) be subject and subordinate to the Carve-Out, (b) have priority over valid, perfected and unavoidable liens that as of the Petition Date were senior to the Prepetition Lender's Liens in the Prepetition Collateral, including those liens permitted under the Prepetition Financing Documents, (c) not include or encumber Avoidance Actions and Recoveries, and (d) have priority over the Prepetition Lender's Liens.

8.  Except as expressly set forth in this Interim Order: (a) the liens and security interests in the DIP Collateral granted in this Interim Order to secure the Postpetition Loans shall not be subject to any lien which is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; and (b) the liens and security interests in the DIP Collateral granted in this Interim Order shall not be subordinated to or made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.  As used in this Interim Order, "Carve-Out" means: (i) unpaid fees of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930 and interest, if any, on such unpaid fees; (ii) unpaid fees and expenses of professionals of the Debtors (excluding "ordinary course professionals" not retained as "professional persons" under sections 327 or 328) and any Committee retained by an order of the Court pursuant to section 327, 328 or 1103(a) of the Bankruptcy Code (the "Professionals"), in each case, incurred prior to the receipt of a Termination Notice (defined in ¶15 below), to the

11

extent such fees and expenses of the Professionals for the Debtors and the Committee are (a) within the amounts set forth in the Budget approved by the DIP Lender, plus the Permitted Variance, (b) subsequently allowed by the Court under sections 330, 331, or 363 of the Bankruptcy Code or other Court order (excluding such "ordinary course professionals"), and (c) not otherwise paid from DIP Collateral or from retainers or any professional expense escrow account established by the Debtors; (iii) any success fee under the Budget (subject to adjustment based on an increase or decrease of the purchase price) that may become due to Media Venture Partners, LLP under the terms of its engagement letter with GLC; (iv) any success fee that may become due to John Summersett under the terms of his Employment Agreement dated as of January 8, 2016; (v) a success fee under the Budget that may become due to Gordon Schreur under his employment contract in the amount of $75,000, (vi) the amount not to exceed $927,661 to pay administrative expenses under the Budget incurred after the closing of a sale of substantially all of the Debtors' assets, and (vii) fees and expenses of any chapter 7 trustee and any chapter 7 professionals in an aggregate amount not to exceed $25,000.  Notwithstanding any other provision in this Interim Order, the Carve-Out shall not include the fees and expenses, if any, of any of the Professionals incurred, directly or indirectly, in respect of, arising from or relating to:  (i) the initiation, joinder or prosecution of any action contesting the indebtedness owed under the Post-Petition Loans or the validity, priority, enforceability or extent of the claims, liens or security interests of the DIP Lender; (ii) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the DIP Lender of any of its rights and remedies under this Interim Order or the DIP Financing Documents (other than to enforce the terms of the Interim Order and the Final Order and or the DIP Financing Documents); (iii) the research, review, analysis, investigation, initiation, prosecution or pursuit of any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender (whether or

not arising from or related to prepetition or postpetition liens, security interests, acts, omissions or other conduct); or (iv) any request to borrow money other than pursuant to the terms of this Interim Order and the DIP Financing Documents. The Carve-Out shall only be available to pay the fees and expenses of Professionals to the extent cash or other immediately available unencumbered and unrestricted funds are not otherwise available at the time or times that any payment of fees or expenses is allowed by the Court under sections 330, 331, or 363 of the Bankruptcy Code or otherwise permitted to be paid by Court Order or applicable bankruptcy law.  The Debtors shall be permitted to pay compensation and reimbursement of expenses allowed consistent with this Interim Order and the Budget (plus any Permitted Variance) and an order of the Court (including pursuant to any monthly interim compensation order that may be entered by the Court), and payable under sections 330, 331 and 363 of the Bankruptcy Code, and the Carve-Out shall be reduced by the amount of any compensation and reimbursement of expenses paid (to the extent ultimately allowed under the Bankruptcy Code) from the DIP Collateral.  Nothing in this Interim Order shall be construed as limiting (A) the amount of compensation and reimbursement of expenses paid or incurred that may be requested by Professionals and ultimately approved by the Court or (B) the right of any party to object to such requests or approvals.  Notwithstanding anything contained in this Interim Order to the contrary, without the consent of the DIP Lender, the right of the Debtors and the Professionals to assert a surcharge under section 506(c) of the Bankruptcy Code against the property securing the claims of the DIP Lender and Prepetition Senior Lender for the amount of fees and expenses incurred by Professionals that exceeds the Budget (plus the Permitted Variance) is waived.  Notwithstanding anything herein to the contrary, DIP Lender will allow up to $7,500.00 of fees to be paid to the Committee's Professionals for the research, review, analysis, investigation, initiation, prosecution or pursuit of any litigation, claim, objection or cause of action of any kind or nature

13

whatsoever against the DIP Lender (whether or not arising from or related to prepetition or post-petition liens, security interests, acts, omissions or other conduct), provided, that from and after March 1, 2016, the Committee will be barred from bringing any action before the Court seeking to challenge the priority or lien rights of the Prepetition Senior Lender's pre-petitions claims. Nothing contained in this Interim Order shall operate to waive any rights and objections of the DIP Lender, Debtor, Committee or any other parties in interest with respect to section 363(f) of the Bankruptcy Code.

9.      In addition, the Postpetition Loans shall have superpriority in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), or 726 of the Bankruptcy Code, (a) subject to the Carve-Out, and (b) excluding proceeds of the Avoidance Actions and Recoveries (which shall not be available to satisfy any claims under section 364(c)(1) or 507(b) of the Bankruptcy Code of the DIP Lender or Prepetition Senior Lender). Notwithstanding section 726 of the Bankruptcy Code, the Postpetition Loans shall also have superpriority over all administrative expenses of a chapter 7 trustee and any chapter 7 professionals to the extent such expenses exceed $25,000 in the aggregate. Except for the Carve-Out and with respect to proceeds of Avoidance Actions and Recoveries, (a) no costs or administrative expenses that have been or may be incurred in the Debtors' chapter 11 cases, in any conversion of the Debtors' chapter 11 cases to a case pursuant to chapter 7 of the Bankruptcy Code, or in any other proceeding related thereto, and (b) no priority claims, including, without limitation, any other superpriority claims, are or will be prior to or on a parity with the claims of the DIP Lender, against the Debtors arising, as applicable, out of the Postpetition Loans or any provision of this Interim Order or with the liens and security interests granted herein on, in and to the DIP Collateral.

14

10.    As adequate protection, and subject to the last sentence in this paragraph 10, the Prepetition Senior Lender is hereby granted (i) valid, binding, enforceable and perfected liens in all DIP Collateral (the "Adequate Protection Liens"), but only to the extent the Prepetition Senior Lender had, as of the Petition Date, valid, perfected, enforceable and unavoidable security interests in the Prepetition Collateral, and only to the extent of any diminution in the value of the Prepetition Senior Lender's valid and perfected (as of the Petition Date) security interests in such collateral, and (ii) superpriority claims (the "Prepetition Debt Priority Claims") in accordance with the provisions of section 507(b) of the Bankruptcy Code over all administrative expenses of the kinds specified in sections 105, 326, 328, 330, 331, 503(b), 507(a), 546(c), or 726 of the Bankruptcy Code, but only to the extent the Prepetition Senior Lender had, as of the Petition Date, valid, perfected, enforceable and unavoidable security interests in the Prepetition Collateral and only to the extent (x) of any diminution in the value of the Prepetition Senior Lender's valid and perfected (as of the Petition Date) security interests in such collateral and (y) the Adequate Protection Liens are inadequate to protect against any such diminution in value.  The Adequate Protection Liens and the Prepetition Debt Priority Claims (a) are subject and subordinate to the Priming Lien granted to secure the Postpetition Loans in the DIP Collateral and the superpriority claims granted to the DIP Lender, (b) are subject and subordinate to the Carve-Out, and (c) shall not be secured by, or repayable from, Avoidance Actions and Recoveries.

11.    Subject to the entry of a Final Order, the Debtors and their estates (and any party in interest acting on behalf of the Debtors with standing to do so under applicable law) hereby irrevocably waive, and are barred from asserting or exercising any right (a) without the DIP Lender's prior written consent (which may be withheld in its sole reasonable discretion) or (b) without the indefeasible payment and satisfaction in full in cash of the Postpetition Loans: (i) to seek or consent to occur any modification, stay, vacation or amendment to the Interim Order, the

15

Final Order or any DIP Financing Document; (ii) to seek or consent to occur a priority claim or administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever including, without limitation, any administrative expense of the kind specified in Bankruptcy Code § 105, 326, 328, 330, 331, 364(c) 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114) equal or superior to the priority claim of the DIP Lender in respect of the obligations under the DIP Financing Documents, except with respect to the Carve-Out or in connection with the Avoidance Actions and Recoveries; (iii) to seek or consent to occur any liens on or security interests in any DIP Collateral having a priority equal or superior to the lien securing the Postpetition Loans, other than with respect to the Carve-Out; (iv) to seek or consent to occur any order which authorizes the payment of any indebtedness incurred prior to the Petition Date (except pursuant to motions or applications filed by the Debtors prior to the entry of the Final Order); (v) to seek or consent to occur any order seeking authority to take any action that is prohibited by the terms of the DIP Financing Documents, the Interim Order or the Final Order or refrain from taking any action that is required to be taken by the terms of the DIP Financing Documents, the Interim Order or the Final Order; (vi) to return goods pursuant to section 546(h) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise; (vii) to seek a surcharge of the DIP Collateral under section 506(c) of the Bankruptcy Code; (viii) to seek nonconsensual use of Cash Collateral under section 363 of the Bankruptcy Code at any time, or (ix) to seek or consent to occur any other action that would materially adversely affect the DIP Lender (in such capacity) in any way.

12.    Unless otherwise ordered by the Court, the Debtors may not obtain entry of an order authorizing a sale of any of their assets outside the ordinary course of business (whether

under a plan of reorganization or otherwise) unless (a) the Postpetition Loans are paid in full or (b) (i) the DIP Lender consents in its sole discretion to such sale (including consent to the form and substance of any asset purchase agreement and any sale order), and (ii) subject to the terms of this Interim Order and the Final Order, and any asset purchase agreement approved by the DIP Lender in its sole discretion, all proceeds realized from any Court-approved sale of DIP Collateral (in excess of the maximum amount necessary to satisfy the Carve-Out, whether or not then incurred or payable) are to be transferred to the DIP Lender for immediate application in reduction of the Postpetition Loans, until payment in full in cash of all Postpetition Loans.

13.    From and after the Petition Date, unless otherwise approved by the DIP Lender, the proceeds of the Postpetition Loans and the DIP Collateral shall not be used to pay expenses of the Debtors or otherwise disbursed except for: (a) those expenses, payments, and/or disbursements that are expressly set forth in the Budget (subject to the Permitted Variance) or otherwise permitted under this Interim Order and the Final Order, including the fees and expenses of Professionals; and (b) amounts due to the DIP Lender, and its accountants, financial consultants, attorneys or other professionals hereunder; provided that nothing in the DIP Financing Documents or this Interim Order is intended or shall be construed to waive any of the DIP Lender's rights to object to or otherwise contest the reasonableness of the fees and expenses of the Professionals.  Neither the proceeds of the DIP Facility nor the Carve-Out shall be utilized (i) to attack the validity, priority or enforceability of any of the postpetition liens or security interests of the DIP Lender, (ii) to research, review, analyze or investigate with respect to or in connection with any litigation, claim, objection or cause of action of any kind or nature whatsoever against the DIP Lender (whether or not arising from or related to pre-petition or postpetition liens, security interests, acts, omissions or other conduct) or (iii) to file, prosecute or otherwise pursue any litigation, claim, objection or cause of action of any kind or nature

17

whatsoever against the DIP Lender (whether or not arising from or related to pre-petition or post-petition liens, security interests, acts, omissions or other conduct).

14.      The automatic stay under section 362(a) of the Bankruptcy Code as it may otherwise be in effect shall be, and it hereby is, modified to the extent necessary to permit the DIP Lender to retrieve, collect, and apply payments and proceeds in respect of the DIP Collateral in the ordinary course of administration of the Postpetition Loan, and to take all acts authorized by the terms and provisions of this Interim Order.

15.      Upon and after receiving written notification of a Termination Event from DIP Lender (a, "Termination Notice"), the Debtors shall no longer, pursuant to this Interim Order or otherwise, be authorized to borrow funds hereunder absent a waiver of the Termination Event or the consent of DIP Lender or, commencing fourteen (14) business days' after the date that a Termination Notice concerning a Termination Event has been given as provided below, to use Cash Collateral (but DIP Lender shall have no obligation to make loans or advances hereunder) without further Court order, except to pay or otherwise fund the payment of (i) the Carve-Out (together with any professional fees and expenses incurred during the prior fourteen (14) business days), (ii) checks and other instruments that have been issued in payment of obligations incurred in accordance with the Budget or in the ordinary course of business after the Petition Date but before the expiration of the fourteenth (14th) business day after Debtors have received a Termination Notice, and (iii) any accrued but unpaid payroll and associated taxes incurred or earned after the Petition Date but before the expiration of the fourteenth (14th) business day after Debtors have received a Termination Notice.  The term "Termination Event" shall mean the occurrence of the earlier of:

(a)      Any of the following "Events of Default":

i.      Debtors shall fail to pay any Postpetition Loans in cash after such payment has become due;

ii.      Any report, certificate or other document delivered to the DIP Lender pursuant to the DIP Financing Documents, the Interim Order or the Final Order shall have been incorrect in any material respect when made or deemed made;

iii.      The failure of the Debtors to comply in all material respects with any covenant, agreement or terms and conditions of the Interim Order, the Final Order and the DIP Financing Documents;

iv.      Any of the Debtors is enjoined, restrained or in any way prevented by the order of any court or any governmental authority from conducting all or any material part of its business for more than three (3) consecutive business days;

v.      Any material damage to, or material loss, theft or destruction of, any DIP Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty (whether or not insured) which causes, in each case, for more than three (3) consecutive business days, the cessation or substantial curtailment of revenue producing activities at any facility of the Debtors, if any such event or circumstance could reasonably be expected to have a material adverse effect on the DIP Collateral;

vi.      The entry of an order in the Bankruptcy Cases which stays, modifies (in any manner adverse to the DIP Lender), or reverses the Interim Order or Final Order or which otherwise materially adversely affects, as determined by the DIP Lender in its sole discretion, the effectiveness of the Interim Order or Final Order without the express written consent of the DIP Lender, provided, however, that any terms in the Final Order consented to by DIP Lender in its sole discretion that are different from the Interim Order shall not constitute an Event of Default;

vii.      The conversion of any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

viii.      The appointment of a trustee for the Debtors;

ix.      The dismissal of any Bankruptcy Case; provided that the DIP Lender has not consented in writing to such dismissal;

x.      The entry of any order which provides relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 that permits any creditor to (i) realize upon, or to exercise any right or

19

remedy with respect to, any material portion of the DIP Collateral, or (ii) to terminate any license, franchise or similar agreement, where, in each case, the exercise of such right or remedy or such realization or termination would be reasonably likely to have a material adverse effect on the DIP Collateral;

xi.    Subject to the allowance and payment of any amounts due under the Carve-Out, the filing of any application by the Debtors without the express written consent of the DIP Lender for the approval of a super-priority claim in the Bankruptcy Cases which is pari passu with or senior to the priority of the claims of the DIP Lender, or there shall arise any such super-priority claim under the Bankruptcy Code;

xii.    Except for payments authorized by order of the Court pursuant to a motion or other application filed prior to the entry of the Final Order or pursuant to the Budget (subject to the Permitted Variance), the payment or other discharge by the Debtors of any prepetition indebtedness without the written consent of the DIP Lender;

xiii.    The filing of any motion by the Debtors seeking, or the entry of any order in the Bankruptcy Cases: (a) permitting working capital or other financing (other than ordinary course trade debt or unsecured debt afforded priority under section 503(b) of the Bankruptcy Code) for any of the Debtors from any person other than the DIP Lender (unless the proceeds of such financing are to be used to pay in full in cash all Postpetition Loans and other obligations arising under the DIP Financing Documents, the Interim Order and the Final Order); (b) granting a lien on, or security interest in, any of the DIP Collateral, other than with respect to the DIP Financing Documents (unless such liens are granted in connection with a financing, the proceeds of which are to be applied to the payment in full in cash of Postpetition Loans and other obligations arising under the DIP Financing Documents, the Interim Order and the Final Order, and other than liens granted as adequate protection for pre-petition liens on the Debtors' assets, which adequate protection liens are junior in priority to the DIP Lender's super priority priming liens); (c) except as permitted by the DIP Financing Documents, the Interim Order or the Final Order or without the prior written consent of DIP Lender, (i) permitting the use of any of the DIP Collateral pursuant to Bankruptcy Code § 363(c), or (ii) permitting recovery from any portion of the DIP Collateral of any costs or expenses of preserving or disposing of such DIP Collateral under Bankruptcy Code § 506(c);

xiv.    The filing of a motion or other pleading by the Debtors seeking the entry of an order confirming a plan of reorganization (and/or approving a disclosure statement related thereto) that does not require payment in full in cash of all Postpetition Loans and other obligations under the DIP Financing Documents, the Interim Order and the Final Order on the consummation date of such plan of reorganization, and as to which the DIP Lender has not consented in writing;

xv.    If any of the DIP Financing Documents, Prepetition Financing Documents, DIP Loan or Prepetition Debt shall be cancelled, terminated, revoked or rescinded; or the DIP Lender's or Prepetition Senior Lender's lien on any of the DIP Collateral or Prepetition Collateral shall cease to be perfected or have the priority contemplated by the DIP Financing Documents and Prepetition Financing Documents (as modified by the Interim Order or Final Order); or any motion, suit, action at law or in equity, or any other legal proceeding to cancel, revoke, rescind or otherwise challenge the DIP Financing Documents, Prepetition Financing Documents or the DIP Lender's or Prepetition Senior Lender's lien on any of the DIP Collateral or Prepetition Collateral is commenced by the Debtors; or any portion of the Interim Order or Final Order is determined to be null and void, invalid or unenforceable by the Court or another court of competent jurisdiction in any action commenced or asserted by any other party in interest in the Bankruptcy Cases;

xvi.    The Debtors shall fail to file a motion seeking approval of sale and bidding procedures for the sale of substantially all of the Debtors' assets by January 27, 2016;

xvii.    The Debtors shall fail to receive Court approval of the sale and bidding procedures for the sale of substantially all of the Debtors' assets by February 22, 2016;

xviii.    The Debtors shall fail to hold the auction for substantially all of the Debtors' assets by March 7, 2016;

xix.    The Debtors shall fail to receive Court approval for the sale of substantially all of Debtors' assets by March 14, 2016;

xx.    The failure to appoint a Chief Restructuring Officer mutually acceptable to the DIP Lender and the Debtors and approved by the Court, with the authority of the highest ranking corporate officer responsible for all final decision making on behalf of the Debtors by March 14, 2016; or

xxi.     The Debtors shall fail to consummate the sale of substantially all of the Debtors' assets by May 11, 2016.

(b)     The Debtors' failure to comply with the terms and conditions of this Interim Order (including, without limitation, the Debtors' failure to comply with the Budget, subject to the Permitted Variance) for more than three (3) consecutive days after receiving written notice of the failure from DIP Lender.

Upon five (5) business days' prior written notice (which notice may be given by facsimile or electronic mail) to (A) the Debtors and their counsel, (B) counsel to any Committee and (C) counsel to the United States Trustee of the occurrence of an Event of Default or Termination Event, which is not subsequently cured or waived during such notice period, (x) the Postpetition Loans shall mature and any and all Postpetition Loans shall become due and payable in full in cash (y) the DIP Lender shall have standing to move for an order to cause the Debtors to engage in a process to liquidate their assets pursuant to Bankruptcy Code § 363; and (z) the DIP Lender shall have the right to an emergency hearing (the "Emergency Hearing") requesting relief from the automatic stay otherwise imposed pursuant to Bankruptcy Code § 362 to permit the DIP Lender to realize upon, or to exercise any right or remedy set forth herein or in the Postpetition Financing Documents or which may otherwise be available at law with respect to any portion of the DIP Collateral.  Nothing in this Interim Order or otherwise shall prohibit or limit or otherwise restrict or condition in any way (a) the Debtors' right to defend against or object to any such relief sought by DIP Lender or to move or apply to the Bankruptcy Court for permission to abandon any property of the estate, including all or any portion of the DIP Collateral, or dismiss or convert any Bankruptcy Case, at any time and for any reason; or (b) the business or assets of Clinton County Telephone Company (a non-debtor subsidiary) or its subsidiaries.

16.     All obligations and commitments of the DIP Lender to make Postpetition Loans shall terminate and all Postpetition Loans shall become due and payable at the earliest of the following (each, a "Due Date"):  (i) May 11, 2016; (ii) the closing of a sale of substantially all of the assets of the Debtors pursuant to a sale conducted in accordance with the time parameters set forth in paragraph 15 of this Interim Order; (iii) the effective date of a confirmed plan of reorganization; (iv) conversion of any Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code; (v) appointment of a trustee for any of the Debtors; (vi) dismissal of any Bankruptcy Case; (vii) forty-five (45) days after entry of this Interim Order if the Final Order has not been entered prior to the expiration of such forty-five (45) day period; (viii) the date on which the Court enters a final order approving a postpetition financing between the Debtors and another lender(s) or investor(s) (as the case may be) (other than the DIP Lender); and (ix) five (5) business days after the DIP Lender notifies the Debtors and their counsel in writing of an Event of Default or Termination Event which is not subsequently cured or waived by the end of such notice period.  The DIP Lender may extend a Due Date in its sole discretion.

17.     Upon or after a Termination Event, the DIP Lender shall be fully authorized to, without providing any prior notice thereof to the Debtors, accelerate the Postpetition Loans and charge interest at the default rate set forth in the DIP Financing Documents.

18.     The rights, remedies, powers and privileges conferred upon the DIP Lender pursuant to this Interim Order shall be in addition to and cumulative with those contained in the DIP Financing Documents to the extent not inconsistent with the terms of this Interim Order.

19.     Notwithstanding the occurrence of a Termination Event or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the DIP Lender under this Interim Order shall survive a Termination Event except to the extent otherwise provided in this Interim Order.  Upon a Termination Event, the Postpetition Loans shall be immediately due

23

and payable and the DIP Lender shall have all rights and remedies provided in the DIP Financing Documents and this Interim Order. If it shall be necessary for the DIP Lender, at any time, to exercise any of its rights and remedies hereunder or under applicable law in order to effect repayment of the Postpetition Loans, or to receive any amounts or remittances due hereunder, including without limitation, foreclosing upon and selling all or a portion of the DIP Collateral, the DIP Lender shall, subject to this Interim Order and automatic stay relief from the Court having first been obtained, have the right to exercise such rights and remedies as to all or such part of the DIP Collateral as the DIP Lender shall, in its sole discretion, elect. The DIP Lender shall be entitled to apply the payments or proceeds of the DIP Collateral in accordance with the provisions of this Interim Order, and in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or otherwise.

20.    The stipulations, findings and the release provisions hereof shall be binding upon all parties in interest, including without limitation, the Debtors, all creditors of the Debtors, the Committee and any other committee appointed in these chapter 11 cases.

21.    From and after the date of the entry of this Interim Order, all collections and proceeds of the DIP Collateral or services provided by the Debtors and all other cash or cash equivalents which shall at any time come into the possession or control of any of the Debtors, or to which the Debtors shall become entitled at any time, first shall be deposited in accounts of the Debtors as set forth in the order of the Court approving the Debtors' cash management system prior to disbursement.

22.    The Priming Lien and all other liens and security interests granted herein shall be, and they hereby are, deemed perfected, and no further notice, filing or other act shall be required to effect such perfection; provided, however, if the DIP Lender shall, in its sole discretion,

24

choose to file any mortgages, financing statements, notices of liens and security interests or other similar documents, all such mortgages, financing statements or similar documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order, and the automatic stay of section 362 of the Bankruptcy Code is hereby vacated to effect such filings.  The Debtors shall execute and deliver to the DIP Lender all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to evidence perfection of the liens and security interests granted herein.

23.     The Debtors, upon reasonable notice during ordinary business hours, shall permit representatives, agents and/or employees of the DIP Lender to have reasonable but not continuous access to their premises and their records (without unreasonable interference with the proper operation of the Debtors' businesses) and to make copies and take extracts therefrom and shall cooperate with, consult with, and provide to such persons all such non-privileged information as they may reasonably request.  In addition to the reports required by the DIP Financing Documents, the Debtors shall, by 5:00 p.m. (EDT) on the Wednesday of each week, provide to the DIP Lender, and its counsel, reports (in form satisfactory to the DIP Lender) illustrating the updated weekly actual performance compared to the Budget prepared on a line-item basis, including the calculation of Net Cash Flow and the extent of compliance with the Permitted Variance.

24.     The Debtors shall timely comply with all of the covenants and conditions set forth in this Interim Order and the DIP Financing Documents.

25.     In making decisions to advance money or extend financial accommodations of any nature under this Interim Order or the DIP Financing Documents, in administering any advances, loans, or financial accommodations of any sort under this Interim Order or the DIP Financing Documents, or in taking any other action related to or in connection with any of the

25

foregoing, the DIP Lender shall not owe any fiduciary duty to the Debtors, their creditors or their estates, and the DIP Lender's relationship with the Debtors shall not constitute nor be deemed to constitute a joint venture or partnership with the Debtors.

26.     If any of the Bankruptcy Cases is dismissed, converted, otherwise superseded or substantively consolidated, the DIP Lender's rights and remedies under this Interim Order and the DIP Financing Documents shall be and remain in full force and effect as if such Bankruptcy Case had not been dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding any such dismissal, conversion, supersession or substantive consolidation, all of the terms and conditions of this Interim Order, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect.

27.     The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors).

28.     Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the postpetition financing arrangement contemplated by this Interim Order, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, no such modification, amendment, or vacation shall affect the validity and enforceability of any lien, security interest or priority authorized or created hereby. Notwithstanding any such modification, amendment, or vacation, any claim granted hereunder arising prior to the effective date of such modification, amendment, or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender

shall be entitled to all of the rights, remedies, privileges, and benefits, including the liens and priorities granted herein, with respect to any such claim.

29.     The Debtors are authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, mortgages and financing statements) and to pay fees and expenses that may be required or necessary for the Debtors' performance hereunder, including, without limitation: (a) the execution of any of the DIP Financing Documents, and (b) the payment of the fees and other expenses described herein or in the DIP Financing Documents as such become due, including, without limitation, agent fees, commitment fees, letter of credit fees and facility fees and reasonable attorneys', financial advisers,' accountants' fees and disbursements and other costs and expenses as set forth in the DIP Financing Documents.

30.     The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtors to obtain credit on the terms and conditions upon which the Debtors and the DIP Lender have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under section 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in section 364(e) of the Bankruptcy Code.

31.     The Debtors shall, within two (2) business days following the entry of this Interim Order, serve by United States mail, first class postage prepaid, copies of the Motion with its attachments, this Interim Order, and a notice of the hearing to be held on _____ (the "Final Hearing") to consider entry of the Interim Order (with any necessary or required changes) as the Final Order on:  (a) counsel to the Committee, if any; (b) the creditors included on the list filed under Rule 1007(d); (c) the Office of the United States Trustee; (d) counsel to the Prepetition Senior Lender; (e) counsel to the DIP Lender; (f) all parties identified in financing

27

statements appearing of record with the State of Michigan as of January 19, 2016, or otherwise known to the Debtors to have or assert liens on or security interests in any of the Debtors' assets; (g) the Internal Revenue Service; (h) all governmental agencies having taxing authority over the Debtors, and (i) all parties who have timely filed requests for notice under Rule 2002 of the Bankruptcy Rules. The Final Hearing notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the United States Bankruptcy Court Clerk for the Western District of Michigan no later than **February __, 2016** ("Objection Deadline"), which objections shall be served (with a copy to chambers) so that the same are received on or before such date by:

(a) counsel for the Debtors, c/o Miller, Canfield, Paddock and Stone, P.L.C., Attn: Stephen S. LaPlante and Jonathan S. Green, 150 West Jefferson, Suite 2500, Detroit, Michigan 48226;

(b) counsel for Prepetition Senior Lender and DIP Lender, c/o Buchanan Ingersoll & Rooney PC, Attn: Christopher P. Schueller and Timothy P. Palmer, One Oxford Centre, 20th Fl, Pittsburgh, PA 15219; and

(c) the Office of the United States Trustee.

Notwithstanding the Objection Deadline, any Committee that may be appointed in these Bankruptcy Cases may file an objection within 14 days of its formation. If no objections are timely filed, the Interim Order may become a Final Order without the Final Hearing. If a timely objection is filed and served, then the Final Hearing will be held.

32. Notwithstanding anything to the contrary herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (a) any of the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) adequate protection of their

28

respective interests in the DIP Collateral or relief from or modification of the automatic stay under section 362 of the Bankruptcy Code, (ii) request conversion of the chapter 11 cases to chapter 7, and (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, (b) the right of DIP Lender or the Debtors to move the Court to interpret or enforce the terms of this Interim Order or the Final Order, as applicable, or (c) any other rights, claims or privileges (whether legal, equitable or otherwise) not expressly addressed in this Interim Order.

33.    The equipment acquired or improved, or to be acquired or approved, in whole or in part, with federal funds under NTIA/BTOP Grant Award ##NT10BIX5570099 (to Bloomingdale Communications, Inc. in which GLC is a sub-recipient) and NT10BIX5570114 (to Merit Network, Inc. in which GLC is a sub-receipt) (identified in financing statements 2014022078-0 and 2014022275-8 filed by the National Telecommunications and Information Administration, U.S. Department of Commerce, "NTIA") (collectively, "BTOP Equipment") is subject to a federal interest of the NTIA during the useful life of such BTOP Equipment and, notwithstanding anything to the contrary in this Interim Order, the DIP Financing Documents or otherwise, including the liens granted to DIP Lender in paragraph 7 hereof or the Adequate Protection Liens granted to Prepetition Senior Lender in paragraph 10 hereof, any lien granted in or against the BTOP Equipment under this Interim Order or the DIP Financing Documents is subordinate to the federal interest in the BTOP Equipment in all respects and is only granted to the extent permitted by applicable law concerning the federal interest.

34.    One or both of the Debtors has received financing from the Prepetition Senior Lender subject to the Farm Credit Act.  One or both of the Debtors is entitled to receive annual distributions of cash dividends, stock in the Prepetition Senior Lender or other equities from the Prepetition Senior Lender (the stock and other equities, the "Equities").  Pursuant to 12 U.S.C. §

29

2131(c), the Prepetition Senior Lender holds a first priority statutory lien on all such Equities. Pursuant to 12 U.S.C. §2131(d), the Prepetition Senior Lender is hereby permitted to retire and cancel all such Equities (including, without limitation, any Equities which accrued but have not been distributed to Debtors prior to the Petition Date) at the fair market value thereof not to exceed par.  The Prepetition Senior Lender is granted stay relief and is permitted to exercise set off rights to retire and cancel all such Equities.  The Debtors shall receive a credit against the Prepetition Debt for the fair market value of the Equities not to exceed par.  Moreover, for any cash dividends which accrued prior to the Petition Date in favor of the Debtors which are payable by the Prepetition Senior Lender, the Prepetition Senior Lender is granted stay relief and is permitted to exercise set off rights to apply all such dividends to the Prepetition Debt.

35.    Notwithstanding anything to the contrary in this Interim Order or the Motion, the DIP Lender's rights, if any, to use and/or occupy any premises leased by the Debtors in the event of an Event of Default shall be limited to such rights (a) as may be ordered by the Bankruptcy Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (b) to which the applicable landlord agrees in writing with the DIP Lender; or (c) already existing under applicable non-bankruptcy law.

36.    To the extent any provisions in this Interim Order conflict with any provisions of the Motion, the DIP Loan Agreement or any of the other DIP Financing Documents, the provisions of this Interim Order shall control.

37.    This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.  There is no just reason to delay enforcement or appeal of this Interim Order.

**END OF ORDER**

30

*Order prepared and submitted by:*

Jonathan S. Green (P33140)
Stephen S. LaPlante (P48063)
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420
Green@millercanfield.com

Proposed Attorneys to the Debtors
and Debtors in Possession

25746613.18\088888-01643
1/25/16

31

# *EXHIBIT A*

## DIP CREDIT AND SECURITY AGREEMENT

THIS DIP CREDIT AND SECURITY AGREEMENT (*"DIP Loan Agreement or Agreement"*), dated as of January 27, 2016, is by and among Great Lakes Comnet, Inc. (*"Comnet"*), a Michigan corporation and Comlink L.L.C., a Michigan limited liability company (*"Comlink"*, collectively with Comnet, the *"Borrower"*) and CoBank, ACB (*"Lender"* or *"DIP Lender"*).

## RECITALS

On January 25, 2016 (*"Petition Date"*), Borrower filed a voluntary petition with the Bankruptcy Court for the Western District of Michigan (*"Bankruptcy Court"*) and has continued in the possession of their respective assets and in the management of their businesses pursuant to Section 1107 and 1108 of the Bankruptcy Code (Bankruptcy Case Numbers _____, (the *"Bankruptcy Cases"*).

Comnet has executed that certain Amended and Restated Master Loan Agreement, dated as of August 1, 2011 (as heretofore amended, supplemented, amended and restated or otherwise modified, the *"Existing Agreement"* and together with all documents and agreements delivered in connection therewith, the "Prepetition Loan Documents" or as referred to in the Interim Order and sometimes herein, "Prepetition Financing Agreements"), which were thereafter personally guaranteed by Comlink (each of Comlink's guaranties, the *"Guaranties"*). Pre-petition indebtedness in the aggregate amount of approximately $25,165,732.05 is outstanding under the Existing Agreement (together with all other obligations thereunder and under the Pre-petition Loan Documents, the *"Pre-petition Obligations"* or, as referred to in the Interim Order and sometimes herein, "Prepetition Debt"). The Pre-petition Obligations are secured by valid and perfected first priority liens for borrowed money (the *"Pre-petition Liens"*) in all of the assets of Borrower (other than assets described as "excepted property" or "deleted" in financing statements and amendments of record filed by Lender before the Petition Date) in favor of Lender.

The Borrower has applied to the Lender for a debtor-in-possession credit facility in an aggregate principal amount not to exceed the Maximum Advance Amount (as hereinafter defined). The proceeds of the Advances (as hereinafter defined) will be used as specifically set forth in the Budget (as hereinafter defined).

Borrower has provided security for the repayment of the Advances and the payment of the other Obligations (as hereinafter defined) of the Borrower hereunder and under the Other Documents (as hereinafter defined), as more fully described in herein.

IN CONSIDERATION of the mutual covenants and undertakings herein contained, Borrower and Lender hereby agree as follows:

### 1.    DEFINITIONS

#### 1.1    Accounting Terms.

As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP.

#### 1.2    General Terms.

For purposes of this Agreement the following terms shall have the following meanings:

"*363 Sale*" means the sale of all or substantially all of the assets of any or all of the Borrower under section 363 of the Bankruptcy Code.

"*Advances*" shall mean money disbursed to Borrower as part of the loan hereunder.

"*Auction*" means an auction held in connection with a 363 Sale.

"*Advances*" shall mean and include the loan advances under this Agreement and, as referred to in the Interim Order and the Final DIP Order, the Postpetition Loans.

"*Affiliate*" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"*Agreement*" shall mean this DIP Credit and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"*Applicable Law*" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"*Authority*" shall have the meaning set forth in Section 4 hereof.

"*Bankruptcy Code*" shall mean 11 U.S.C. §§ 101 *et seq.*

"*Bankruptcy Court*" shall mean United States Bankruptcy Court for the Western District of Michigan.

"*Borrower*" shall have the meaning set forth in the preamble to this Agreement, and is referred to as a "Debtor" in the singular and together the "Debtors" in the Interim Order and Final DIP Order, and shall extend to all permitted successors and assigns of such Persons.

"*Borrower on a consolidated basis*" shall mean the Borrower.

"*Borrower's Account*" shall have the meaning set forth in Section 2 hereof.

"*Budget*" shall mean a weekly cash flow budget for the Borrower prepared by the Borrower and which is approved by Lender in its sole discretion, and will include any Permitted Variance as defined in the Interim Order. A copy of the current Budget is attached as **Exhibit A**. The Budget may be amended from time to time upon the written consent of Borrower and Lender.

2

*"Bulk Sale of Inventory"* shall mean a sale of an Inventory outside the ordinary course of business for cash in excess of $25,000.

*"Business Day"* shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in New York City, New York.

*"Capitalized Lease Obligation"* shall mean any Indebtedness of a Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

*"CERCLA"* shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

*"Charges"* shall mean all taxes, charges, fees, imposts, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including, without limitation, the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral or the Borrower.

*"Closing Date"* shall mean January 27, 2016 or such date as may be agreed by the parties hereto, but not before entry of the Interim Order.

*"Code"* shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

*"Collateral"* shall mean and include all of the Borrower's personal property, including without limitation:

(a)    all Receivables;

(b)    all Equipment;

(c)    all General Intangibles;

(d)    all Inventory;

(e)    all Investment Property;

(f)    all Real Property;

(g)    all Subsidiary Stock;

(h)    the Leasehold Interests;

(i)    all of Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located, (i) Intellectual Property; (ii) all of Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the

3

Obligations; (v) all of Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts, letters of credit, and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by Borrower, all real and personal property of third parties in which Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; and (x) any other goods, personal property or real property now owned or hereafter acquired in which Borrower has expressly granted a security interest or may in the future grant a security interest to Lender hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Lender and Borrower. "Collateral" does not include Avoidance Actions and Recoveries as defined in the Interim Order, and the Liens granted in favor of the Lender in the Collateral are subject to the Federal Interest as described in paragraph 33 of the Interim Order.

(j)    all of Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g), (h) or (i) of this Paragraph; and

(k)    all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h), (i) and (j) of this paragraph in whatever form, including, but not limited to: cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"*Consents*" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement, the Other Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"*Controlled Group*" shall mean, at any time, Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with Borrower, are treated as a single employer under Section 414 of the Code.

"*Customer*" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both pursuant to which a Debtor is to deliver any personal property or perform any services.

"*Default*" shall mean an event, circumstance or conditions which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"*Default Rate*" shall have the meaning set forth in Section 3.1 hereof.

"*Depository Accounts*" shall have the meaning set forth in Section 4 hereof.

"*Documents*" shall have the meaning set forth in Section 8 hereof.

4

"*Dollar*" and the sign "$" shall mean lawful money of the United States of America.

"*Environmental Laws*" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"*Equipment*" shall mean and include all of Borrower's goods (other than Inventory) whether now owned or hereafter acquired and wherever located including, without limitation, all equipment, machinery, apparatus, motor vehicles, fittings, furniture, furnishings, fixtures, parts, accessories and all replacements and substitutions therefor or accessions thereto.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"*Event of Default*" shall have the meaning set forth in the Interim Order.

"*Exchange Act*" shall have the mean the Securities Exchange Act of 1934, as amended.

"*Federal Interest*" shall mean the federal interest, if any, of the National Telecommunications Information Administration, U.S. Department of Commerce under NTIA/BTOP Grant Award #NTIOBIX5570099 (to Bloomingdale Communications, Inc. in which Comnet is a sub-recipient) and #NTIOBIX5570114 (to Merit Network, Inc. in which Comnet is a sub-recipient).

"*Final DIP Order*" shall mean a final order of the Bankruptcy Court authorizing (I) Borrower to obtain DIP Loans as defined in and on the terms of the Interim Order on a final basis, and (II) granting adequate protection to Lender pursuant to the Adequate Protection Liens defined in the Interim Order.

"*GAAP*" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"*General Intangibles*" shall mean and include all of Borrower's general intangibles, whether now owned or hereafter acquired including, without limitation, all payment intangibles, choses in action, causes of action, corporate or other business records, inventions, designs, patents, patent applications, equipment formulations, manufacturing procedures, quality control procedures, trademarks, service marks, trade secrets, goodwill, copyrights, design rights, software, computer information, source codes, codes, records and dates, registrations, licenses, franchises, customer lists, tax refunds, tax refund claims, computer programs, all claims under guaranties, security interests or other security held by or granted to Borrower to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature.

"*Governmental Body*" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"*Hazardous Substance*" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as

amended (49 U.S.C. Sections 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"*Hazardous Wastes*" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"*Indebtedness*" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"*Intellectual Property*" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"*Intellectual Property Claim*" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"*Interest Rate*" shall mean the Prime Rate (currently 3.5%) plus 6.5%. "Prime Rate" shall mean a variable rate of interest per annum equal, on any day, to the rate of interest published on such day in the Eastern Edition of *The Wall Street Journal* as the average prime lending rate for 75% of the United States' 30 largest commercial banks, or if the Eastern Edition of *The Wall Street Journal* or such rate is not published on such day, such rate as last published in the Eastern Edition of *The Wall Street Journal*. In the event the Eastern Edition of *The Wall Street Journal* ceases to publish such rate or an equivalent on a regular basis, the term "*Prime Rate*" shall be determined on any day by reference to such other regularly published average prime rate for such date applicable to such commercial banks as is acceptable to the DIP Lender in its sole discretion. Any change in Prime Rate shall be automatic, without the necessity of notice provided to the Borrower.

"*Interim Order*" shall mean an interim order of the Bankruptcy Court (I) authorizing Borrower to obtain post-petition DIP Loans and (II) granting the "Adequate Protection Liens" to Lender.

"*Inventory*" shall mean and include all of Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

6

"*Investment Property*" shall mean and include all of Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"*Leasehold Interests*" shall mean all of Borrower's right, title and interest in and to the premises where Borrower leases real property.

"*Lender*" shall have the meaning set forth in the preamble to this Agreement, is referred to as DIP Lender in the Interim Order and Final DIP Order, and shall extend to all of its successors and assigns.

"*License Agreement*" shall mean any agreement between Borrower and a Licensor pursuant to which Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of Borrower or otherwise in connection with Borrower's business operations, including without limitation any franchisees.

"*Licensor*" shall mean any Person from whom Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with Borrower's business.

"*Licensor/Lender Agreement*" shall mean an agreement between Lender and a Licensor, in form and content satisfactory to Lender, by which Lender is given the unqualified right, vis-à-vis such Licensor, to enforce Lender's Liens with respect to and to dispose of Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of Borrower's default under any License Agreement with such Licensor.

"*Lien*" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"*Lien Waiver Agreement*" shall mean an agreement which is executed in favor of Lender by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Lender from time to time to enter upon the premises to inspect or remove the Collateral from such premises or to use such premises to store or dispose of such Inventory.

"*Material Adverse Effect*" shall mean a material adverse effect on (a) the condition (financial or otherwise), result of operations, assets, business, properties or prospects of a Debtor's ability to duly and punctually pay the Obligations in accordance with the terms thereof, (b) the value of the Collateral, or Lender's Liens on the Collateral or the priority of any such Lien or (c) the practical realization of the benefits of Lender's rights and remedies under this Agreement and the Other Documents.

"*Maximum Advance Amount*" shall mean $5,500,000 (inclusive of the Permitted Advance Variance) of principal through May 11, 2016.

"*Monthly Advances*" shall have the meaning set forth in Section 3.1 hereof.

"*Mortgage*" shall mean the mortgage on the Real Property securing the Obligations together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

7

"*Multiemployer Plan*" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"*Multiple Employer Plan*" shall mean a Plan which has two or more contributing sponsors (including the Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"*Note*" or "*Notes*" shall mean the DIP Credit Note(s) or, as it is referred to in the Interim Order, the "DIP Note".

"*Obligations*" shall mean and include any and all loans, advances, debts, liabilities, obligations, covenants and duties owing by Borrower to Lender under this Agreement and the Other Documents of any kind or nature, present or future (including any interest accruing thereon after maturity, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, whether or not for the payment of money, whether arising by reason of an extension of credit, opening or honoring of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Lender's non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of Borrower's Indebtedness and/or liabilities under this Agreement, the Other Documents and any amendments, extensions, renewals or increases and all costs and expenses of Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of Borrower to Lender to perform acts or refrain from taking any action. "Obligations" do not include any of the foregoing types of Obligations under or incurred or arising in connection with the Existing Agreement, including the Pre-petition Obligations, or the Prepetition Financing Documents, including Prepetition Debt as defined in the Interim Order.

"*Ordinary Course of Business*" shall mean the ordinary course of Borrower's business as conducted on the Closing Date.

"*Other Documents*" shall mean any and all other agreements, instruments and documents, including, without limitation, guaranties, mortgages, pledges, powers of attorney, consents, and all other writings heretofore, now or hereafter executed by Borrower and/or delivered to Lender in respect of the transactions contemplated by this Agreement. "Other Documents" do not include the Existing Agreement or any of the Pre-petition Loan Documents or the Prepetition Financing Documents (defined in the Interim Order).

"*Parent*" of any Person shall mean a corporation or other entity owning, directly or indirectly at least 50% of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors of the Person, or other Persons performing similar functions for any such Person.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

8

"*Pension Benefit Plan*" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"*Permitted Advance Variance*" shall mean a cumulative unfavorable variance of no more than $500,000 from the projected net cash flow set forth on the line of the Budget entitled " Cumulative Net Cash Flows Before DIP Financing" at the time of any determination and is defined as the "Permitted Variance" in the Interim Order.

"*Permitted Encumbrances*" shall mean the valid, perfected and unavoidable liens that as of the Petition Date (defined in the Interim Order) were senior to the liens of the Prepetition Senior Lender (defined in the Interim Order), including those liens permitted under the Prepetition Financing Documents (defined in the Interim Order) or the Pre-petition Loan Documents.

"*Person*" shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity or Governmental Body (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"*Plan*" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of Borrower or any member of the Controlled Group or any such Plan to which Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"*Properly Contested*" shall mean, in the case of any Indebtedness of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Lender (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"*Real Property*" shall mean all of Borrower's right, title and interest in and to each premises owned or leased by it.

"*RCRA*" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

9

"*Receivables*" shall mean and include, as to Borrower, all of Borrower's accounts, contract rights, instruments (including those evidencing indebtedness owed to Borrower by its Affiliates), documents, chattel paper (including electronic chattel paper), general intangibles relating to accounts, drafts and acceptances, credit card receivables, and all other forms of obligations owing to Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Lender hereunder.

"*Reportable Event*" shall mean a reportable event described in Section 4043(b) of ERISA or the regulations promulgated thereunder.

"*Requisite Priority*" means:

(i) the DIP Lender's first lien on the Collateral for the amounts due under this DIP Loan Agreement and DIP Note; and then

(ii) the Pre-petition indebtedness under the Prepetition Loan Documents.

"*SEC*" shall mean the Securities and Exchange Commission or any successor thereto.

"*Sale Order*" means the order entered by the Bankruptcy Court in form and substance satisfactory to the Lender in its respective sole discretion, approving a 363 Sale and/or the results of an Auction.

"*Sale Procedures Motion*" means a motion seeking entry of a Sales Procedures Order, which motion shall be in form and substance reasonably satisfactory to the Lender.

"*Sale Procedures Order*" means an order approving the procedures for a 363 Sale.

""*Securities Act*" shall mean the Securities Act of 1933, as amended.

"*Settlement Date*" shall mean the Closing Date and thereafter Wednesday of each week unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"*Subsidiary*" shall mean a corporation or other entity of whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"*Subsidiary Stock*" shall mean all of the issued and outstanding equity interests of any Subsidiary owned by Borrower.

"*Term*" shall have the meaning set forth in Section 14.1 hereof.

"*Termination Date*" has the meaning specified in the Interim Order.

"*Third Party APA*" means an asset purchase agreement which asset purchase agreement is in form and substance satisfactory to the Lender in its respective sole discretion, providing for the purchase of certain of the assets of any of the Borrower, entered into between the Borrower and a Person who is not a party to this Agreement or owned directly or indirectly by an party to this Agreement.

"*Toxic Substance*" shall mean and include any material present on the Real Property or the Leasehold Interests which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 *et seq.*, applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"*Transferee*" shall have the meaning set forth in Section 16.3(b) hereof.

"*Uniform Commercial Code*" shall have the meaning set forth in Section 1.3 hereof.

"*Variance Report*" means a report setting forth a line item comparison of actual net cash flow to budgeted net cash flow for the immediately preceding week and on a cumulative basis from the Petition Date through the end of the immediately preceding week, including calculation of whether the Borrower is in compliance with the Permitted Advance Variance.

"*Week*" shall mean the time period commencing with the opening of business on a Monday and ending on the end of business the following Friday.

1.3    Uniform Commercial Code Terms.

All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Michigan from time to time (the "*Uniform Commercial Code*") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the *terms "accounts", "chattel paper", "instruments", "general intangibles", "payment intangibles", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment"* and *"fixtures"*, as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4    Certain Matters of Construction.

The terms "*herein*", "*hereof*" and "*hereunder*" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Lender is a party, including references to any of the Other Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. All references herein to the time of day shall mean the time in Michigan. Whenever the words "*including*" or "*include*" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Lender. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of

11

Lender, any agreement entered into by Lender pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Lender pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Lender, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Lender. Wherever the phrase "to the best of Borrower's knowledge" or words of similar import relating to the knowledge or the awareness of Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

## 2.    ADVANCES, PAYMENTS

### 2.1    Advances.

(a)    Subject to the terms and conditions set forth in this Agreement and subject to the Permitted Advance Variance, Lender will make Advances upon the Request of the Borrower.

(b)    Additional conditions for each Advance are set forth in Section 8.2.

### 2.2    [Reserved

### 2.3    Disbursement of Advance Proceeds.

All Advances shall be disbursed from whichever office or other place Lender may designate from time to time and, together with any and all other Obligations of Borrower to Lender, shall be charged to Borrower's Account on Lender's books.

### 2.4    Maximum Advances.

The aggregate principal balance of Advances outstanding at any time shall not exceed the Maximum Advance Amount.

### 2.5    Repayment of Advances.

(a)    The Advances shall be due and payable in full on the fifth (5th) Business Day after the day on which notice is given pursuant to paragraph 15 of the Interim Order of the occurrence of a Termination Date or on the Due Date (defined in the Interim Order). Comnet and Comlink shall be jointly and severally liable for all Obligations.

(b)    [Reserved]

12

(c)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Lender at 6340 S. Fiddlers Green Circle, Greenwood Village, CO 80111 not later than 1:00 P.M. (New York City Time) on the due date therefor in lawful money of the United States of America in federal funds or other funds immediately available to Lender; provided, however, should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Lender, or with respect to any other Obligation, become due, same shall be deemed a request for an Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Lender, and such request shall be irrevocable.

(d)     Borrower shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.6     [Reserved]

2.7     Statement of Account.

Lender shall maintain, in accordance with its customary procedures, a loan account ("*Borrower's Account*") in the name of Borrower in which shall be recorded the date and amount of each Advance made by Lender and the date and amount of each payment in respect thereof; provided, however, the failure by Lender to record the date and amount and allocation of any Advance shall not adversely affect Lender. Each month, Lender shall send to Borrower a statement showing the accounting for the Advances made, payments made or credited in respect thereof, and other transactions between Lender and Borrower, during such month. The monthly statements shall be deemed correct and binding upon Borrower in the absence of manifest error and shall constitute an account stated between Lender and Borrower unless Lender receives a written statement of Borrower's specific exceptions thereto within thirty (30) days after such statement is received by Borrower. The records of Lender with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.8     No Discharge; Survival of Claims; Confirmation of Chapter 11 Plan.  The Borrower agrees that (i) Obligations hereunder shall not be discharged by the entry of an order confirming any Chapter 11 Plan (and Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) any superpriority claim granted to the Lender pursuant to the Interim Order and the Liens granted to the Lender and the Lender shall not be affected in any manner by the entry of an order confirming a Chapter 11 Plan. Under no circumstances shall a Chapter 11 Plan be approved without the written consent of Lender.

2.9     Security Interest in Bank Accounts, Cash and Cash Management System.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Borrower hereby assigns and pledges to the Lender and hereby grants to the Lender, a first priority security interest, except to the extent provided in the Interim Order, the Final Order or both, senior to all other Liens, if any, in all of the Borrower's right, title and interest in and to the Borrower's bank accounts and any investment of the funds contained therein and the proceeds thereof.

2.10    [Reserved].

13

2.11    Mandatory Prepayments.

When Borrower sells or otherwise disposes of any Collateral outside the Ordinary Course of Business (including without limitation in a 363 Sale), Borrower shall repay the Advances in an amount equal to the net proceeds of such sale (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Lender. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Subject to the terms of the Interim Order or Final DIP Order, as applicable, including payment of the Carve-Out, such repayments shall be in the Requisite Priority.

2.12    Use of Proceeds.

(a)    Borrower shall apply the proceeds of Advances to provide for the working capital needs of the Borrower as set forth in the Budget, to pay fees and expenses relating to this transaction and as permitted in the Interim Order and Final DIP Order.

(b)    Except to the extent provided in the Interim Order or the Final DIP Order, Borrower shall not use or permit the use of Advances to (i) pay any item other than in accordance with the Budget, or (ii) pay claims for services rendered by any of the attorneys, accountants and other professionals retained by the Borrower or by any statutory committee appointed by the Bankruptcy Court in the Borrower's chapter 11 case, in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (A) challenging the amount, validity, perfection, priority, ranking or enforceability of or asserting any defense, counterclaim or offset to, the Obligations under this Agreement, the Pre-petition Obligations or the Liens of the Lender in respect thereof or (B) preventing, hindering or otherwise delaying. whether directly or indirectly, the exercise by the Lender of any of its respective rights and remedies under the Pre-petition Loan Documents, this Agreement, the Other Agreements, the Interim or Final DIP Order, or the Lender's enforcement or realization upon any of the liens on or security interests in any Collateral.

3.    INTEREST AND FEES.

3.1    Interest.

Interest on Advances shall be payable in arrears and shall be paid on a monthly basis. Interest charges shall be computed on the actual principal amount of Advances outstanding during the month (the "*Monthly Advances*") at a rate per annum equal to the Interest Rate. Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the Interest Rate plus five percent (5%) per annum (the "*Default Rate*").

3.2    Computation of Interest and Fees.

Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other

14

than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Interest Rate during such extension.

### 3.3    Maximum Charges.

In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by Borrower, and if the then remaining excess amount is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate.

## 4.    SECURITY AND ADMINISTRATIVE PRIORITY; GENERAL COLLATERAL TERMS

4.1    Pre-Petition Obligations. The Borrower hereby acknowledges, confirms and agrees that, as of the Petition Date, it is liable to the Lender for the Pre-Petition Obligations, consisting of the (i) balance due under the Existing Agreement in the aggregate amount of approximately $25,165,732.05, (ii) costs, expenses, fees (including reasonable attorneys' fees) and other charges now or hereafter owed by the Borrower to the Lender, all of which are unconditionally owing by the Borrower to the Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever. The Borrower and Lender agree that the Lender is entitled to post-Petition Date accruing interest on the Prepetition Debt (defined in the Interim Order) and costs, expenses, fees (including reasonable attorneys' fees) and other charges incurred or arising after the Petition Date in connection with the Prepetition Debt if, and only to the extent, allowed under sections 502(b)(2) and 506(b) of the Bankruptcy Code.

4.2    Acknowledgement of Security Interests. The Borrower hereby acknowledges, confirms and agrees that Lender shall continue to have valid, enforceable and perfected and, except to the extent otherwise provided as to priority in the Interim Order or the Final DIP Order, first priority Liens upon and security interests in all Collateral heretofore granted to Lender pursuant to the Existing Agreement, as in effect on the Petition Date to secure all of the Pre-petition Obligations.

4.3    Binding Effect of Documents. Borrower hereby acknowledges, confirms and agrees that: (a) each of the Pre-petition Loan Documents to which it is a party has been duly executed and delivered to the Lender by it and is in full force and effect as of the Petition Date; (b) each of the Pre-Petition Loan Documents constitutes a legal, valid, and binding obligation of the Borrower enforceable against it, in accordance with their respective terms and the Borrower has no valid defense, offset or counterclaim to the enforcement of such obligations and (c) subject to the Interim Order and the Final DIP Order, including the effect of the automatic stay, the Lender is and shall be entitled to all of the rights, remedies and benefits provided for in the Pre-petition Loan Documents.

4.4    Collateral; Grant of Lien and Security Interest.

(a)    As security for the full and timely payment and performance of the Obligations and Advances, effective upon and subject to the entry of the Interim Order and subject to the Federal Interest described in paragraph 33 of the Interim Order, contemporaneously with the first Advance hereunder, Borrower hereby assigns, pledges, transfers and grants to the Lender for the benefit of the Lender, a security interest in and to and lien on all property, assets, or interests in the Collateral.

15

(b)    Upon entry of the Final DIP Order, the Liens and security interest in favor of the Lender shall be valid and perfected liens and security interests in the Collateral, with the priority in accordance with the Final DIP Order. Such Liens and security interests and their priority shall remain in effect until the Obligations have been terminated and all Obligations have been repaid in cash in full.

(c)    All Liens granted under this Agreement and any Other Document (the "*Collateral Documents*") shall secure the Obligations in favor of the Lender hereunder.

4.5    Administrative Priority. Borrower agrees that, except to the extent otherwise provided in the Interim Order or the Final DIP Order, the Obligations shall constitute allowed administrative expenses in the Borrower's chapter 11 case having priority over all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation all administrative expenses of the kind specified in Section 503(b) and 507(b) of the Bankruptcy Code.

4.6    No Filings Required. The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Final DIP Order. The Lender shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or prefect the lien and security interest granted by or pursuant to this Agreement and/or the Final DIP Order.

4.7    Survival. The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to the Pre-petition Loan Documents, this Agreement or the Other Documents (specifically including, but not limited to, the existence, perfection and priority of the liens and security interests provided herein and therein, and the administrative priority provided herein and therein), except to the extent provided in the Interim Order or Final DIP Order, shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal, conversion or the Borrower's chapter 11 case, or by any act or omission whatsoever.

4.8    Disposition of Collateral.

Borrower will safeguard and protect all Collateral for Lender's general account and make no disposition thereof whether by sale, lease or otherwise except (a) the sale in the Ordinary Course of Business; (b) the sale of other Collateral as approved by Lender and made pursuant to Court order under the provisions of 11 U.S.C. § 363.

4.9    Preservation of Collateral.

Following the occurrence of an Event of Default, subject to the Interim Order, Final DIP Order and first having obtained relief from the automatic stay in the Bankruptcy Cases, Lender: (a) may at any time take such steps as Lender deems necessary to protect Lender's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Lender may deem appropriate; (b) may employ and maintain at any of Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Lender's interests in the Collateral; (c) may lease warehouse facilities to which Lender may move all or part of the Collateral; (d) may use Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrower's owned or

16

leased property. Borrower shall cooperate fully with all of Lender's reasonable efforts to preserve the Collateral and, assuming sufficient funding, resources and the ability to do so, will take such actions to preserve the Collateral as Lender may direct. All of Lender's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as an Advance and added to the Obligations.

4.10    Defense of Lender's Interests.

Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Lender's interests in the Collateral shall continue in full force and effect. During such period Borrower shall not, without Lender's prior written consent or an order entered in the Bankruptcy Cases, pledge, sell, assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral. At any time following the occurrence of an Event of Default, upon first obtaining relief from the automatic stay in the Bankruptcy Cases, Lender shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including: labels, stationery, documents, instruments and advertising materials. If Lender exercises this right to take possession of the Collateral, Borrower shall, upon demand, assemble it in the best manner possible and make it available to Lender at a place reasonably convenient to Lender if the Borrower has sufficient funding, resources and the ability to do so. In addition, with respect to all Collateral, subject to the Interim Order, Final DIP Order and relief from the automatic stay having first been obtained in the Bankruptcy Cases, Lender shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law. Subject to the Interim Order, Final DIP Order and relief from the automatic stay having first been obtained in the Bankruptcy Cases, Borrower shall, and Lender may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Lender holds a security interest to deliver same to Lender and/or subject to Lender's order and if they shall come into Borrower's possession, they shall be held by Borrower in trust as Lender's trustee, and Borrower will immediately deliver them to Lender in their original form together with any necessary endorsement.

4.11    Books and Records.

Borrower shall (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in accordance with, or as required by, GAAP consistently applied.

4.12    Financial Disclosure.

Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by Borrower at any time during the Term to exhibit and deliver to Lender copies of any of Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Lender any information such accountants may have concerning Borrower's financial status and business operations. Borrower hereby authorizes all Governmental Bodies to furnish to Lender copies of any reports or examinations relating to Borrower, whether made by Borrower or

otherwise; however, Lender will attempt to obtain such information or materials directly from Borrower prior to obtaining such information or materials from such accountants or such authorities.

### 4.13   Compliance with Laws.

Borrower shall comply in all material respects with all acts, rules, regulations and Applicable Laws with respect to the Collateral or any part thereof or to the operation of Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect on Borrower. Borrower may, however, contest or dispute any Applicable Laws in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Lender to protect Lender's Lien on or security interest in the Collateral. The Collateral and all other assets of Borrower, if any, at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the Collateral and all other assets of Borrower, if any, so that such insurance shall remain in full force and effect.

### 4.14   Inspection of Premises.

At all reasonable times Lender shall have full access to and the right to audit, check, inspect and make abstracts and copies from Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and, to the extent not subject to any privilege, the operation of Borrower's business. Lender, and its agents may enter upon any of Borrower's premises at any time during business hours and at any other reasonable time, and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and, to the extent not subject to any privilege, the operation of Borrower's business.

### 4.15   Insurance.

The assets and properties of Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of Borrower so that such insurance shall remain in full force and effect. Borrower shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At Borrower's own cost and expense in amounts and with carriers acceptable to Lender, Borrower shall (a) keep all its insurable properties and properties in which Borrower has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including, without limitation, business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to Borrower insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; (e) furnish Lender with (i) copies of all policies and evidence of the maintenance of such policies by the renewal thereof at least thirty (30) days before any expiration date, and (ii) appropriate loss payable endorsements in form and substance satisfactory to Lender, naming Lender as a co-insured and loss payee as its interests may appear with respect to all insurance coverage referred to in clauses (a) and (c) above, and providing (A) that all proceeds thereunder shall be payable to Lender, (B) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (C) that such policy and loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Lender. In the event of any loss thereunder, the carriers named therein hereby are

directed by Lender and the Borrower to make payment for such loss to Lender and not to Borrower and Lender jointly. If any insurance losses are paid by check, draft or other instrument payable to Borrower and Lender jointly, Lender may endorse Borrower's name thereon and do such other things as Lender may deem advisable to reduce the same to cash. Lender is hereby authorized to adjust and compromise claims under insurance coverage referred to in clauses (a) and (b) above. All loss recoveries received by Lender upon any such insurance may be applied to the Obligations, in such order as Lender in its sole discretion shall determine. Any surplus shall be paid by Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Borrower to Lender, on demand. All loss recoveries shall be treated as the proceeds of Collateral and treated in accordance with the Interim Order and the Final DIP Order, and subject to the Carve-Out (as defined in the Interim Order).

### 4.16    Failure to Pay Insurance.

If Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Lender, if Lender so elects, may obtain such insurance and pay the premium therefor on behalf of Borrower, and charge Borrowers' Account therefor as an Advance and such expenses so paid shall be part of the Obligations but shall not reduce the Maximum Advance Amount.

### 4.17    Payment of Taxes.

Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon Borrower or any of the Collateral including, without limitation, real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes. If any tax by any Governmental Body may be imposed on or as a result of any transaction between Borrower and Lender which Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Lender's opinion, may possibly create a valid Lien on the Collateral, Lender may without notice to Borrower pay the taxes, assessments or other Charges and Borrower hereby indemnifies and holds Lender harmless in respect thereof. The amount of any payment by Lender under this Section shall be charged to Borrower's Account as an Advance and added to the Obligations (but shall not reduce the Maximum Advance Amount) and, until Borrowers shall furnish Lender with an indemnity therefor (or supply Lender with evidence satisfactory to Lender that due provision for the payment thereof has been made), Lender may hold without interest any balance to Borrower's credit and Lender shall retain its security interest in any and all Collateral held by Lender.

### 4.18    Payment of Leasehold Obligations.

Borrower shall at all times pay, when and as due, its post-petition rental obligations under all leases under which it is a tenant and for which Borrower has not filed a lease rejection motion, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Lender's request will provide evidence of having done so.

### 4.19    [Reserved]

### 4.20    Adjustments.

Borrower will not, without Lender's consent, compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the business of Borrower.

19

4.21    Maintenance of Equipment.

The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved. Borrower shall not use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.22    Exculpation of Liability.

Nothing herein contained shall be construed to constitute Lender as Borrower's agent for any purpose whatsoever, nor shall Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Lender does not, whether by anything herein or in any assignment or otherwise, assume any of Borrower's obligations under any contract or agreement assigned to Lender, and Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

5.    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as follows:

5.1    Authority.

Subject to the prior entry of the Interim Order, Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents and to perform all its respective Obligations hereunder and thereunder. Upon entry of the Interim Order, this Agreement and the Other Documents will constitute the legal, valid and binding obligation of Borrower enforceable in accordance with their terms, except as such enforceability may be limited by any applicable bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally. The execution, delivery and performance of this Agreement and of the Other Documents (a) are within Borrower's corporate powers, have been duly authorized, and, upon entry of the Interim Order, are not in contravention of law or the terms of Borrower's by-laws, certificate of incorporation or other applicable documents relating to Borrower's formation or to the conduct of Borrower's business or of any material agreement or undertaking to which Borrower is a party or by which Borrower is bound, (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body or any other Person, all of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of Borrower under the provisions of any agreement, charter document, instrument, by-law, or other instrument to which Borrower is a party or by which it or its property is a party or by which it may be bound.

5.2    Formation and Qualification.

(a)    Borrower is duly incorporated, or otherwise duly organized and existing, in the respective states of their formation, and is qualified to do business and is in good standing in the states where they operate which constitute all states in which qualification and good standing are necessary for Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on Borrower. Borrower has delivered to Lender true and complete copies of its certificate of

20

incorporation or certificate of formation and by-laws or similar instrument and will promptly notify Lender of any amendment or changes thereto.

(b)     Borrower has no Subsidiaries of Borrower other than Clinton County Telephone Company, Westphalia Telephone Company and Westphalia Broadband, Inc.

5.3     Survival of Representations and Warranties.

All representations and warranties of Borrower contained in this Agreement and the Other Documents shall be true at the time of Borrower's execution of this Agreement and the Other Documents, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto.

5.4     Tax Returns.

Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and has paid all taxes, assessments, fees and other governmental charges that are due and payable. With the exception of the audit of the Internal Revenue Service of fiscal years 2012 through 2014 which is ongoing, Federal, state and local income tax returns of Borrower have been examined and reported upon by the appropriate taxing authority or closed by applicable statute and satisfied for all fiscal years prior to and including the fiscal year ending December, 2014. The provision for taxes on the books of Borrower are adequate for all years not closed by applicable statutes, and for its current fiscal year, and Borrower has no knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

5.5     O.S.H.A. and Environmental Compliance.

(a)     Borrower has duly complied with, and its facilities, business, assets, property, leaseholds and Equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws; there have been no outstanding citations, notices or orders of non-compliance issued to Borrower or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations.

(b)     Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c)     (i) There are no visible signs of releases, spills, discharges, leaks or disposal (collectively referred to as "*Releases*") of Hazardous Substances at, upon, under or within any Real Property or any premises leased by Borrower; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property or any premises leased by Borrower; (iii) neither the Real Property nor any premises leased by Borrower has ever been used as a treatment, storage or disposal facility of Hazardous Waste; and (iv) no Hazardous Substances are present on the Real Property or any premises leased by Borrower, excepting such quantities as are handled in accordance with all applicable manufacturer's instructions and governmental regulations and in proper storage containers and as are necessary for the operation of the commercial business of Borrower or of its tenants.

5.6     Licenses and Permits.

21

Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state or local law or regulation for the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to procure such licenses or permits could have a Material Adverse Effect on Borrower.

    5.7    No Waiver of Defaults Under Existing Agreement.

Borrower acknowledges that by entering into this DIP Loan Agreement, Lender is not waiving or modifying any of their rights or any Events of Default under the Existing Agreement.

    5.8    Disclosure.

No representation or warranty made by Borrower in this Agreement or in any financial statement, report, certificate or any other document furnished in connection herewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to Borrower or which reasonably should be known to Borrower which Borrowers has not disclosed to Lender in writing with respect to the transactions contemplated by this Agreement which could reasonably be expected to have a Material Adverse Effect on Borrower.

    5.9    Swaps.

Borrower is not a party to, nor will it be a party to, any swap agreement whereby Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

    5.10    Conflicting Agreements.

No provision of any mortgage, indenture, contract, agreement, judgment, decree or order binding on Borrower or affecting the Collateral conflicts with, or requires any Consent which has not already been obtained to, or would in any way prevent the execution, delivery or performance of, the terms of this Agreement or the Other Documents.

    6.    AFFIRMATIVE COVENANTS

Borrower shall, until payment in full of the Obligations and termination of this Agreement:

    6.1    Payment of Fees.

Pay to Lender on demand all usual and customary fees and expenses which Lender incurs in connection with the forwarding of Advance proceeds.

    6.2    Conduct of Business and Maintenance of Existence and Assets.

Until a sale of all or substantially all of Borrower's assets in the Bankruptcy Cases, Borrower shall conduct continuously and operate actively its business according to good business practices and, assuming sufficient funding and other resources to do so, maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including, without limitation, all licenses, patents, copyrights, design rights, trade names, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any intellectual property right or other right included in the

22

Collateral; (b) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect on Borrower; and (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof.

### 6.3   Violations.

Promptly notify Lender in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to Borrower which could reasonably be expected to have a Material Adverse Effect on Borrower.

### 6.4   Execution of Supplemental Instruments.

Execute and deliver to Lender from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Lender may reasonably request, in order that the full intent of this Agreement may be carried into effect.

### 6.5   Payment of Indebtedness.

Pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature which have arisen after the Petition Date, except when the failure to do so could not reasonably be expected to have a Material Adverse Effect, or Borrower does not have sufficient funding or availability in accordance with the Budget, or when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and Borrower shall have provided for such reserves as Lender may reasonably deem proper and necessary, subject at all times to any applicable subordination arrangement in favor of Lender.

### 6.6   Standards of Financial Statements.

Cause all financial statements referred to herein as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein).

### 6.7   363 Sale and Plan Confirmation Milestones.

The Debtors shall comply with the milestones (the *"Milestones"*) set forth in the Interim Order or as otherwise consented to by the DIP Lender in its sole discretion in writing.

### 6.8   Weekly Reporting on 363 Sale.

The Debtors shall provide weekly updates to the DIP Lender on all 363 Sale efforts, and the DIP Lender shall be free at all times to speak directly to any financial advisor or investment banker retained by the Debtors to assist in the 363 Sale process.

23

6.9     Opposition to Certain Motions.

Subject to sufficient funding being made available, Borrower shall promptly and diligently oppose all Motions filed by Persons in the Bankruptcy Court to lift the stay on the Collateral, all Motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Borrower to file a Plan of Reorganization (other than Motions filed by Lender), and all other Motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a Material Adverse Effect on Lender or any Collateral.

6.10    Entry of Final Order.

Borrower shall ensure that the Interim Order is entered in a form and content satisfactory to Lender in its sole discretion no later than January 30, 2016 and the Final Order shall have been entered by the Bankruptcy Court on terms and conditions satisfactory to Lender no later than March 15, 2016.

7.      NEGATIVE COVENANTS

Borrower shall not, until satisfaction in full of the Obligations and termination of this Agreement:

7.1     Merger, Consolidation, Acquisition and Sale of Assets.

(a)     Without the consent of Lender in its sole and absolute discretion, enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or stock of any Person or permit any other Person to consolidate with or merge with it.

(b)     Without the consent of Lender in its sole and absolute discretion or order entered in the Bankruptcy Cases upon prior notice to Lender, sell, lease, transfer or otherwise dispose of any of its properties or assets outside the ordinary course of business.

7.2     Creation of Liens.

Except to the extent provided in the Interim Order or the Final DIP Order, create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

7.3     Guarantees.

Become liable upon the obligations of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lender).

7.4     Loans.

Make advances, loans or extensions of credit to any Person, including, without limitation, any Parent, Subsidiary or Affiliate, except in the Ordinary Course of Business consistent with the Budget and its past practices.

7.5     Capital Expenditures.

In any fiscal year, contract for, purchase, make or incur any expenditure, liability or commitment (including the total principal portion of Capitalized Lease Obligations incurred or contracted for in such

24

period) for fixed or capital assets or improvements, replacements, substitutions or additions thereto, which have a useful life of more than one year, except as otherwise provided for in the Budget.

### 7.6    Indebtedness.

Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except in respect of (a) Indebtedness to Lender; (b) Indebtedness incurred for capital expenditures permitted under Section 7.5 hereof; (c) other Indebtedness permitted in the Budget, as acceptable to the Lender in its sole discretion.

### 7.7    Nature of Business.

Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the ordinary course of business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted.

### 7.8    Transactions with Affiliates.

Directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, or otherwise enter into any transaction or deal which is not in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms which would have been obtainable from a Person other than an Affiliate.

### 7.9    Leases.

Enter as lessee into any lease arrangement for real or personal property except as provided for in the Budget.

### 7.10    Subsidiaries.

(a)    Form any Subsidiary unless (i) such Subsidiary expressly joins in this Agreement as a borrower and becomes jointly and severally liable for the obligations of Borrower hereunder, under the Notes, and under any other agreement between Borrower and Lender and (ii) Lender shall have received all documents, including legal opinions, it may reasonably require to establish compliance with each of the foregoing conditions.

(b)    Enter into any partnership, joint venture or similar arrangement.

### 7.11    Fiscal Year and Accounting Changes.

Change its fiscal year from calendar year-end or make any change (a) in accounting treatment and reporting practices except as required by GAAP or (b) in tax reporting treatment except as required by law.

### 7.12    Pledge of Credit.

Now or hereafter pledge Lender's credit on any purchases or for any purpose whatsoever or use any portion of any Advance in or for any business other than Borrower's business as conducted on the date of this Agreement except to the extent provided in the Budget or otherwise acceptable to Lender.

25

7.13    Amendment of Articles of Incorporation, By-Laws.

Amend, modify or waive any term or material provision of its Articles of Incorporation or By-Laws, or other similar organizational documents unless required by law.

7.14    Compliance with ERISA.

(a) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans maintained by Borrower immediately prior to the Petition Date, (b) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in section 406 of ERISA and Section 4975 of the Code, (c) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (d) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of Borrower or any member of the Controlled Group or the imposition of a lien on the property of Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (e) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan not maintained by Borrower immediately prior to the Petition Date, (f) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan, (g) fail promptly to notify Lender of the occurrence of any Termination Event, (h) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Plan, (i) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

7.15    Budget.

At any time permit the difference between (a) actual total cash receipts (exclusive of borrowings of Postpetition Loans (Advances hereunder) and cash on hand immediately prior to the Petition Date) and (b) actual total cash disbursements for the cumulative period beginning on and continuing after the Petition Date ("Net Cash Flow") to vary unfavorably by more than $500,000 from line of the Budget entitled "Cumulative Net Cash Flows Before DIP Financing" for the same period.

### 8.    CONDITIONS PRECEDENT

8.1    Conditions to Initial Advances.

The agreement of Lender to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by Lender, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

(a)    Notes and Other Documents.  Lender shall have received the Notes and required other Documents duly executed and delivered by an authorized officer of Borrower.

(b)    Corporate Proceedings of Borrower.  Lender shall have received a copy of the resolutions in form and substance reasonably satisfactory to Lender, of the Board of Directors or other appropriate governing body of Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Notes and the Other Documents and any other related agreements, (collectively the "*Documents*") and

(ii) the granting by Borrower of the security interests in and liens upon the Collateral;

(c)    Interim Order. The Interim Order in form and substance satisfactory to the Lender shall have been issued by the Bankruptcy Court;

(d)    Other. All corporate and other proceedings, and all documents, instruments and other legal matters in connection herewith shall be satisfactory in form and substance to Lender and its counsel.

8.2    Conditions to Advance.

The agreement of Lender to make any Advance requested to be made on any date (including, without limitation, the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a)    Representations and Warranties. Each of the representations and warranties made by Borrower in or pursuant to this Agreement and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(b)    No Default. No Termination Event shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Lender, in its sole discretion, may continue to make Advances notwithstanding the existence of a Termination Event and that any Advances so made shall not be deemed a waiver of any such Termination Event;

(c)    Maximum Advances. In the case of any Advances requested to be made, after giving effect thereto, the aggregate Advances shall not exceed the maximum amount of Advances permitted under Section 2.4 hereof; and

Each request for an Advance by Borrower hereunder shall constitute a representation and warranty by Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

## 9.    INFORMATION AS TO BORROWER.

Borrower shall, until satisfaction in full of the Obligations and the termination of this Agreement:

9.1    Disclosure of Material Matters.

Immediately upon learning thereof, report to Lender all matters materially affecting the value, enforceability or collectability of any portion of the Collateral including, without limitation, Borrower's reclamation or repossession of, or the return to Borrower of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

9.2    Litigation.

27

Promptly notify Lender in writing of any claim, litigation, suit or administrative proceeding affecting Borrower or any Guarantor, whether or not the claim is covered by insurance, and of any suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

### 9.3    Material Occurrences.

Promptly notify Lender in writing upon the occurrence of (a) any Event of Default; (b) any event, development or circumstance whereby any financial statements or other reports furnished to Lender fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of Borrower as of the date of such statements; (c) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject Borrower to a tax imposed by Section 4971 of the Code; and (d) any other development in the business or affairs of Borrower or any Guarantor which could reasonably be expected to have a Material Adverse Effect, in each case describing the nature thereof and the action Borrower proposes to take with respect thereto.

### 9.4    Reporting.

On the Wednesday of each Week, the Borrower shall furnish a Variance Report to Lender.

### 9.5    Additional Information.

Furnish Lender with such additional information as Lender shall reasonably request in order to enable Lender to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrower including, without limitation and without the necessity of any request by Lender, (a) copies of all environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of Borrower's opening of any new office or place of business or Borrower's closing of any existing office or place of business, and (c) promptly upon Borrower's learning thereof, notice of any labor dispute to which Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which Borrower is a party or by which Borrower is bound.

### 9.6    Notice of Suits, Adverse Events.

Furnish Lender with prompt notice of (a) any lapse or other termination of any Consent issued to Borrower by any Governmental Body or any other Person that is material to the operation of Borrower's or Guarantor's business, (b) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (c) copies of any periodic or special reports filed by Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of Borrower or any Guarantor, or if copies thereof are requested by Lender, and (d) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to Borrower or any Guarantor.

### 9.7    ERISA Notices and Requests.

Furnish Lender with immediate written notice in the event that (a) Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC

28

with respect thereto, (b) Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (c) a funding waiver request has been filed with respect to any Plan together with all communications received by Borrower or any member of the Controlled Group with respect to such request, (d) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which Borrower or any member of the Controlled Group was not previously contributing shall occur, (e) Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (f) Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter; (g) Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice; (h) Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment; (i) Borrower or any member of the Controlled Group knows that (i) a Multiemployer Plan has been terminated, (ii) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan, or (iii) the PBGC has instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

        9.8     Additional Documents.

        Execute and deliver to Lender, upon request, such documents and agreements as Lender may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

                        10.     EVENTS OF DEFAULT

        10.1    Events of Default. It shall constitute an event of default ("Event of Default") if any one or more of the "Events of Default" identified in the Interim Order or the Final DIP Order, as applicable, shall occur for any reason. Those "Events of Default" are incorporated herein by this reference.

                        11.     REMEDIES.

        (a)     If an Event of Default exists, without further order or application to the Bankruptcy Court, the Lender may, in its discretion, by written notice to the Borrower (with a copy to counsel for any statutory committee appointed in the Case and the United State Trustee), restrict the amount of or refuse to make Advances. If an Event of Default exists, unless otherwise noted below, without further order of or application to the Bankruptcy Court, the Lender may, do one or more of the following, in addition to the actions described in the preceding sentence, at any time or times and in any order, by written notice to the Borrower (with a copy to counsel for any statutory committee appointed in the Case and the United States Trustee): (a) terminate this Agreement; (b) declare any or all Obligations to be immediately due and payable without notice or demand of any kind; (c) subject to having first obtained relief from the automatic stay in the Bankruptcy Cases, enforce rights under this Agreement, the Existing Agreement, the Other Documents, or orders of the Bankruptcy Court, including rights of set off; (d) subject to having first obtained relief from the automatic stay in the Bankruptcy Cases, pursue its other rights and remedies under this Agreement, the Other Documents, the orders of the Bankruptcy Court and applicable law and (e) subject to the Interim Order, the Final DIP Order or any other order in the Bankruptcy Cases, terminate the use of cash collateral.

(b)      If an Event of Default exists, the Lender may, subject to the provisions of the Final DIP Order or the Interim Order, as applicable, and after having first obtained relief from the automatic stay in the Bankruptcy Cases, in addition to any rights now or hereafter existing under applicable law, and without application to or further order of the Bankruptcy Court, shall have all rights as a secured creditor under the UCC and otherwise available at law in all relevant jurisdictions and may:

> (i)      personally, or by agents or attorneys, immediately retake possession of the Collateral or any part thereof, from the Borrower or any other Person who then has possession of any part thereof with or without notice or process of law (but subject to any requirements of law), and for that purpose may enter upon the Borrower's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of Borrower;

> (ii)     instruct the obligor or obligors on any agreements, instrument or other obligation constituting the Collateral to make any payment required by the terms of such instrument or agreement directly to the Lender;

> (iii)    withdraw all monies, securities and instruments held by Lender for application to the Obligations as provided for in this Agreement;

> (iv)     sell, assign or otherwise liquidate, or direct the Borrower to sell, assign or otherwise liquidate, any or all of the Collateral or any part thereof and take possession of the proceeds of any such sale, assignment or liquidation; and

> (v)      take possession of the Collateral or any part thereof, by directing the Borrower in writing to deliver to the same to the Lender at any place or places designated by the Lender, in which event the Borrower shall, if it has sufficient funding to do so, at its own expense:

>> (A)      forthwith cause the same to be moved to the place or places so designated by the Lender and there delivered to the Lender,

>> (B)      store and keep any Collateral so delivered to the Lender at such place or places pending further action by the Lender as provided in this Agreement, and

>> (C)      while the Collateral shall be so stored and kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition;

it being understood that the Borrower's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to the Bankruptcy Court, the Lender shall be entitled to a decree requiring specific performance by the Borrower of such obligation.

(c)      If an Event of Default exists, subject to the Interim Order, Final DIP Order, or any order entered in the Bankruptcy Cases, and after having first obtained relief from the automatic stay in the Bankruptcy Cases, without further application to or order of the Bankruptcy Court, any Collateral repossessed by the Lender and any other Collateral whether or not so repossessed by the Lender, may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at

30

such time or times, at such place or places and at such terms as the Lender may, in compliance with applicable law, determine to be commercially reasonable. Any of the Collateral may be sold, leased or otherwise disposed in the condition in which the same existed when taken by the Lender or after any overhaul or repair which the Lender shall determine to be commercially reasonable. Any such disposition which shall be a private sale or other private proceeding permitted by applicable law shall be made upon not less than 20 days' written notice to the Borrower specifying the time at which such disposition is to be made and the intended sale price or other consideration thereof, and shall be subject, for the 20 days after the giving of such notice to the right of the Borrower or any nominee of the Borrower to acquire the Collateral involved at a price or for such other consideration at least equal to the intended sale price or other consideration so specified. Any such disposition which shall be a public sale permitted by law shall be made upon not less than 20 days' written notice to the Borrower specifying the time and place of such sale and, in the absence of applicable law, shall be by public auction (which may at the Lender's option, be subject to reserve) after publication of notice of such auction not less than 20 days prior thereto in USA Today and The Wall Street Journal, National Edition. To the extent permitted by any such law, the Lender on behalf of the Lender may bid for and become the purchaser of the Collateral or any item thereof, offered for sale without accountability to the Borrower (except to the extent of surplus money received). If, under mandatory law, the Lender shall be required to make disposition of the Collateral within a period of time which does not permit the giving of notice to the Borrower as hereinabove specified, the Lender need give the Borrower only such notice of disposition as shall be reasonably practicable.

(i)     EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE BORROWER HEREBY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW:

(ii)    NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE LENDER'S TAKING POSSESSION OR THE LENDER'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING, WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES AND ANY SUCH RIGHT WHICH THE BORROWER WOULD OTHERWISE HAVE UNDER ANY REQUIREMENT OF LAW AND THE BORROWER HEREBY FURTHER WAIVES, TO THE EXTENT PERMITTED BY LAW:

(iii)   ALL DAMAGES OCCASIONED BY SUCH TAKING OF POSSESSION EXCEPT ANY DAMAGES WHICH ARE THE DIRECT RESULT OF THE AGENT'S OR ANY LENDER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT;

(iv)    ALL OTHER REQUIREMENTS AS TO THE TIME, PLACE AND TERMS OF SALE OR OTHER REQUIREMENTS WITH RESPECT TO THE ENFORCEMENT OF THE AGENT'S RIGHTS HEREUNDER; AND

(v)     ALL RIGHTS OF REDEMPTION, APPRAISEMENT, VALUATION, STAY, EXTENSION OR MORATORIUM NOW OR HEREAFTER IN FORCE UNDER ANY APPLICABLE LAW IN ORDER TO PREVENT OR DELAY THE ENFORCEMENT OF THIS AGREEMENT OR THE ABSOLUTE SALE OF THE COLLATERAL OR ANY PORTION THEREOF, AND THE BORROWER , FOR ITSELF AND ALL WHO MAY CLAIM UNDER IT, INSOFAR AS IT NOW OR HEREAFTER LAWFULLY MAY, HEREBY WAIVES THE BENEFIT OF ALL SUCH LAWS.

(d)    Lender shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Lender may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Lender's rights hereunder.

(e)    In addition to any other rights which Lender may have under applicable law, upon the occurrence of an Event of Default hereunder and after first having obtained relief from the automatic stay, Lender shall have a right to apply Borrower's property held by Lender to reduce the Obligations.

(f)    The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative. In exercising its rights and remedies, Lender shall obtain and/or cooperate in obtaining all necessary Consents (including, but not limited to, any required Consents from the Federal Communications Commission), and shall comply with Applicable Law.

## 12.    ALLOCATION OF PAYMENTS

Notwithstanding any other provisions of this Agreement to the contrary, all amounts collected or received by the Lender on account of the Obligations or any other amounts outstanding under any of the Other Documents or in respect of the Collateral shall be paid over or delivered as set forth in the Interim Order or Final DIP Order, as applicable.

## 13.    WAIVERS AND JUDICIAL PROCEEDINGS

### 13.1    Waiver of Notice.

Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein or in the Interim Order or Final DIP Order, as applicable.

### 13.2    Delay.

No delay or omission on Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any default.

### 13.3    Jury Waiver.

EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT

A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

### 14.    EFFECTIVE DATE AND TERMINATION

#### 14.1    Term.

This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of Borrower and Lender, shall become effective on the date hereof and shall continue in full force and effect until May 11, 2016 (the "*Term*") unless sooner terminated as herein provided.

#### 14.2    Termination.

The termination of the Agreement shall not affect Borrower's, Lender's rights or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully disposed of, concluded or liquidated. The security interests, Liens and rights granted to Lender hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrower's Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished Lender with an indemnification satisfactory to Lender with respect thereto. Accordingly, Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid in full in immediately available funds. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are paid or performed in full.

### 15.    MISCELLANEOUS

#### 15.1    Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio applied to contracts to be performed wholly within the State of Michigan.

#### 15.2    Entire Understanding.

        (a)    This Agreement, the Interim Order and, as applicable, the Final DIP Order, and the documents executed concurrently herewith contain the entire understanding between Borrower and Lender and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by Borrower's and Lender's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.

33

Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)     The Lender and Borrower may from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed by Borrower, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lender or Borrower thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements. Any such supplemental agreement shall apply equally to Lender and shall be binding upon Borrower and Lender and all future holders of the Obligations. In the case of any waiver, Borrower, Lender shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

In addition to (and not in substitution of) the discretionary Advances permitted above in this section, Lender is hereby authorized by Borrower and Lender, from time to time in Lender's sole discretion, (A) after the occurrence and during the continuation of an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 8.2 hereof have not been satisfied, to make Advances to Borrower which Lender, in its reasonable business judgment, deems necessary or desirable (i) to preserve or protect the Collateral or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (iii) to pay any other amount chargeable to Borrower pursuant to the terms of this Agreement.

15.3    Successors and Assigns.

(a)     This Agreement shall be binding upon and inure to the benefit of Borrower, Lender, all future holders of the Obligations and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Lender.

(b)     Borrower acknowledges that in the regular course of commercial banking business Lender may at any time and from time to time sell participating interests in the Advances to other financial institutions (each such transferee or purchaser of a participating interest, a "*Participant*"). Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that Borrower shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder and in no event shall Borrower be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant. Borrower hereby grants to any Participant a continuing security interest in any deposits, moneys or

34

other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.

(c)     Lender may sell, assign or transfer all or any part of its rights under this Agreement and the Other Documents to one or more additional banks or financial institutions and one or more additional banks or financial institutions may commit to make Advances hereunder (each a "*Purchasing Lender*", and together with each Participant, each a "*Transferee*" and collectively the "*Transferees*"), in minimum amounts of not less than $100,000.

(d)     Borrower authorizes Lender to disclose to any Transferee and any prospective Transferee any and all financial information in such Lender's possession concerning Borrower which has been delivered to such Lender by or on behalf of Borrower pursuant to this Agreement or in connection with such Lender's credit evaluation of Borrower.

15.4    Application of Payments.

Lender shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that Borrower makes a payment or Lender receives any payment or proceeds of the Collateral for Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Lender.

15.5    Indemnity.

Borrower shall indemnify Lender, and each of its respective officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Lender in any bankruptcy, litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Lender is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment). BORROWER HEREBY INDEMNIFIES, DEFENDS AND HOLDS THE LENDER, AND ITS DIRECTORS, OFFICERS, AGENTS, EMPLOYEES AND COUNSEL, HARMLESS FROM AND AGAINST ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES, DEFICIENCIES, JUDGMENTS, PENALTIES OR EXPENSES IMPOSED ON, INCURRED BY OR ASSERTED AGAINST ANY OF THEM, WHETHER DIRECT, INDIRECT OR CONSEQUENTIAL, ARISING OUT OF OR BY REASON OF ANY LITIGATION, INVESTIGATIONS, CLAIMS, OR PROCEEDINGS (WHETHER BASED ON ANY FEDERAL, STATE OR LOCAL LAWS OR OTHER STATUTES OR REGULATIONS, INCLUDING, WITHOUT LIMITATION, SECURITIES, ENVIRONMENTAL, OR COMMERCIAL LAWS AND REGULATIONS, UNDER COMMON LAW OR AT EQUITY, OR IN CONTRACT OR OTHERWISE) COMMENCED OR THREATENED, WHICH ARISE OUT OF OR ARE IN ANY WAY BASED UPON THE NEGOTIATION, PREPARATION, EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE OR ADMINISTRATION OF THIS AGREEMENT, THE ORDERS ANY OTHER DOCUMENT, OR ANY UNDERTAKING OR PROCEEDING RELATED TO ANY OF THE

TRANSACTIONS CONTEMPLATED HEREBY OR BY THE ORDERS OR ANY ACT, OMISSION TO ACT, EVENT OR TRANSACTION RELATED OR ATTENDANT THERETO, INCLUDING, WITHOUT LIMITATION, AMOUNTS PAID IN SETTLEMENT, COURT COSTS, AND THE FEES AND EXPENSES OF COUNSEL REASONABLY INCURRED IN CONNECTION WITH ANY SUCH LITIGATION, INVESTIGATION, CLAIM OR PROCEEDING AND FURTHER INCLUDING, WITHOUT LIMITATION, ALL LOSSES, DAMAGES (INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL DAMAGES), EXPENSES OR LIABILITIES SUSTAINED BY THE LENDER IN CONNECTION WITH ANY ENVIRONMENTAL INSPECTION, MONITORING, SAMPLING, OR CLEANUP OF THE ENCUMBERED REAL ESTATE REQUIRED OR MANDATED BY ANY ENVIRONMENTAL LAW (ALL OF THE FOREGOING, COLLECTIVELY, THE "INDEMNIFIED LIABILITIES"); PROVIDED, HOWEVER, THAT BORROWER SHALL NOT INDEMNIFY THE LENDER OR ITS DIRECTORS, OFFICERS, AGENTS, EMPLOYEES AND COUNSEL FROM SUCH INDEMNIFIED LIABILITIES RESULTING FROM ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. Without limiting the foregoing, if, by reason of any suit or proceeding of any kind, nature, or description against Borrower, or by Borrower or any other party against the Lender, which in the Lender's sole discretion makes it advisable for the Lender to seek counsel for protection and preservation of its liens and security assets, or to defend its own interest, such expenses and counsel fees shall be allowed to the Lender. To the extent that the undertaking to indemnify, pay and hold harmless set forth herein may be unenforceable because it is violative of any law or public policy, the Borrower shall contribute the maximum portion which they are permitted to pay and satisfy under applicable law, to the payment and satisfaction of all indemnified matters incurred by Lender. The foregoing indemnity shall survive the payment of the Obligations and the termination of this Agreement. All of the foregoing costs and expenses shall be part of the Obligations and secured by the Collateral.

    15.6   Notice.

Any notice or request hereunder may be given to Borrower or to Lender at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section. Any notice, request, demand, direction or other communication (for purposes of this Section 15.6 only, a "*Notice*") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "*e-mail*") or facsimile transmission in accordance with this section. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names in this section or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this section. Any Notice shall be effective:

    (a)   In the case of hand-delivery, when delivered;

    (b)   If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

    (c)   In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

    (d)   In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e)    In the case of electronic transmission, when actually received;

(f)    If given by any other means (including by overnight courier), when actually received.

(A)    If Lender at:

CoBank, ACB
William McOmie
6340 S. Fiddlers Green Circle
Greenwood Village, CO 80111
Telephone:
Telecopier:    _____

and a copy to:

Buchanan Ingersoll & Rooney PC
One Oxford Centre
301 Grant Street
Pittsburgh, Pennsylvania 15219-1410
Attention:      Christopher P. Schueller
Telephone:     (412) 562 8432
Telecopier:    (412) 562 1041

(B)    If to a Lender other than Lender, as specified on the signature pages hereof.

(C)    If to Borrower, at:

Great Lakes Comnet
1515 Turf Lane, Suite 100
East Lansing, MI 48823

Attention: John Summersett
Telephone:     (517) 679-7560
Telecopier:    (517) 324-8900

with a copy to:

Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
Attention: Jonathan S. Green and Stephen S. Laplante
Telephone:     (313) 496-7997
Telecopier:    (313) 496-7500

15.7    Survival.

The obligations of Borrower under Sections 5.5 and 15.5 shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

37

### 15.8    Severability.

If any part of this Agreement is contrary to, prohibited by, or deemed invalid under applicable laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

### 15.9    Expenses.

All costs and expenses including, without limitation, reasonable attorneys' fees (including the allocated costs of in house counsel) and disbursements incurred by Lender on its behalf or on behalf of Lender (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement or any consents or waivers hereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Lender's security interest in or Lien on any of the Collateral, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Lender's transactions with Borrower or any Guarantor, or (e) in connection with any advice given to Lender with respect to its rights and obligations under this Agreement and all related agreements, may be charged to Borrower's Account and shall be part of the Obligations.

### 15.10    Injunctive Relief.

Borrower recognizes that, in the event Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, any remedy at law may prove to be inadequate relief to Lenders; therefore, Lender, if Lender so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

### 15.11    Consequential Damages.

Neither Lender nor any agent or attorney for Lender shall be liable to Borrower for consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations.

### 15.12    Captions.

The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

### 15.13    Counterparts; Telecopied Signatures.

This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement. Any signature delivered by a party by facsimile transmission shall be deemed to be an original signature hereto.

### 15.14    Construction.

The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting

party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

        15.15   Confidentiality; Sharing Information.

            (a)    Lender, and each Transferee shall hold all non-public information obtained by Lender, or such Transferee pursuant to the requirements of this Agreement in accordance with Lender's, and such Transferee's customary procedures for handling confidential information of this nature; provided, however, Lender and each Transferee may disclose such confidential information (i) to its examiners, affiliates, outside auditors, counsel and other professional advisors, (ii) to Lender or to any prospective Transferees and Purchasing Lenders, and (iii) as required or requested by any Governmental Body or representative thereof or pursuant to legal process; provided, further that (A) unless specifically prohibited by applicable law or court order, Lender and each Transferee shall use its best efforts prior to disclosure thereof, to notify the Borrower of the applicable request for disclosure of such non-public information (1) by a Governmental Body or representative thereof (other than any such request in connection with an examination of the financial condition of a Lender or a Transferee by such Governmental Body) or (2) pursuant to legal process and (B) in no event shall Lender, or any Transferee be obligated to return any materials furnished by Borrower other than those documents and instruments in possession of Lender in order to perfect its Lien on the Collateral once the Obligations have been paid in full and this Agreement has been terminated.

            (b)    Borrower acknowledges that from time to time financial advisory, investment banking and other services may be offered or provided to Borrower or one or more of its Affiliates (in connection with this Agreement or otherwise) by Lender or by one or more Subsidiaries or Affiliates of Lender and Borrower hereby authorizes Lender to share any information delivered to Lender by Borrower and its Subsidiaries pursuant to this Agreement, or in connection with the decision of Lender to enter into this Agreement, to any such Subsidiary or Affiliate of Lender, it being understood that any such Subsidiary or Affiliate of Lender receiving such information shall be bound by the provision of Section 15.15 as if it were a Lender hereunder. Such authorization shall survive the repayment of the other Obligations and the termination of the Loan Agreement.

        15.16   Publicity.

Borrower and Lender hereby authorizes Lender to make appropriate announcements of the financial arrangement entered into among Borrower and Lender, including, without limitation, announcements which are commonly known as tombstones, in such publications and to such selected parties as Lender shall in its sole and absolute discretion deem appropriate.

        15.17   Certifications From Banks and Participants; US Patriot Act.

Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated

depository institution or foreign bank) shall deliver to the Lender the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA Patriot Act.

15.18   Release; No Discharge.

As additional consideration for the Lender entering into this Agreement, the Borrower hereby fully and unconditionally releases and forever discharges the Lender, its agents, employers, directors, officers, attorneys, branches, affiliates, subsidiaries, successors and assigns and all persons, firms, corporations and organizations acting on any of their behalves (the "Released Parties") of and from any and all claims, liabilities, demands, obligations, damages, losses, actions and causes of action whatsoever which the Borrower may now have or claim to have against the Lender or any other Released Parties as of the date hereof, whether presently known or unknown and of any nature and extent whatsoever, including, without limitation, on account of or in any way affecting, concerning or arising out of or founded upon the Existing Agreement, the Pre-petition Loan Documents, including but not limited to all such loss or damage of any kind heretofore sustained or that may arise as a consequence of the dealings between the parties up to and including the date hereof, including but not limited to, the administration or enforcement of the Pre-petition-Obligations, or any of the Pre-petition Loan Documents.

[SIGNATURE PAGES FOLLOW]

40

**[SIGNATURE PAGE 1 0F 2 0F CREDIT AND SECURITY AGREEMENT]**

Each of the parties has signed this Agreement as of the day and year first above written.

ATTEST:                                    **GREAT LAKES COMNET, INC.**

_____           BY:_____
                                           Name:_____
                                           Title:_____


                                           **COMLINK L.L.C.**

_____           By:_____

                                           Name:_____
                                           Title:_____

[SIGNATURE PAGE 2 0F 2 0F CREDIT AND SECURITY AGREEMENT]

**COBANK, ACB**

By:_____

Name:

Title:

25834750.12\130050-00009
1/24/16

# *EXHIBIT A*

Great Lakes Comnet and Comlink
Weekly Forecast Beginning With Week Ended January 29, 2016
DIP Budget

| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended: | 1/29/16 | 2/5/16 | 2/12/16 | 2/19/16 | 2/26/16 | 3/4/16 | 3/11/16 | 3/18/16 | 3/25/16 | 4/1/16 | 4/8/16 | 4/15/16 |
| **Cash Receipts** | | | | | | | | | | | | |
| Collections on Existing A/R and Forecasted Collections | | | | | | | | | | | | |
| GLC | 12,984 | 198,326 | 123,497 | 19,026 | 48,146 | 173,403 | 154,880 | 148,436 | 189,834 | 119,470 | 212,258 | 109,228 |
| Comlink | 85,679 | 142,864 | 134,490 | 439,115 | 117,514 | 233,295 | 409,916 | 443,735 | 257,097 | 254,395 | 373,746 | 372,055 |
| Total A/R Receipts and Forecasted Collections | 98,663 | 341,190 | 257,987 | 458,141 | 165,660 | 406,697 | 564,795 | 592,171 | 446,931 | 373,874 | 586,004 | 481,283 |
| Other Cash Receipts (CCTC) | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 |
| **Total Cash Receipts** | 127,885 | 370,412 | 287,209 | 487,363 | 194,882 | 435,919 | 594,017 | 621,393 | 476,153 | 403,096 | 615,226 | 510,505 |
| **Cash Disbursements** | | | | | | | | | | | | |
| Wages | 202,900 | - | 226,791 | - | 246,791 | - | 226,791 | - | 318,291 | - | 226,791 | - |
| Employer 401(k) Contribution | 3,853 | - | 6,570 | - | 7,170 | - | 6,570 | - | 9,315 | - | 6,570 | - |
| Employer Payroll Taxes | 28,952 | - | 32,356 | - | 18,283 | - | 16,753 | - | 23,753 | - | 16,753 | - |
| Health, LT Dis & WC Insurance | 88,047 | - | - | - | 88,047 | - | - | - | 88,047 | - | - | - |
| Circuit Lease Costs/Colocation Rent | 56,380 | 100,800 | 123,011 | 123,011 | 56,380 | 100,800 | 123,011 | 123,011 | 56,380 | 100,800 | 123,011 | 123,011 |
| Taxes | 3,403 | 543,934 | 7,425 | 7,425 | 3,403 | 6,084 | 7,425 | 7,425 | 3,403 | 6,084 | 7,425 | 7,425 |
| Repairs and Maintenance | 12,970 | 23,189 | 28,298 | 28,298 | 12,970 | 23,189 | 28,298 | 28,298 | 12,970 | 23,189 | 28,298 | 28,298 |
| Construction and Equipment | 43,077 | 77,016 | 295,986 | 93,986 | 43,077 | 77,016 | 93,986 | 93,986 | 43,077 | 77,016 | 93,986 | 93,986 |
| Professional Services | 19,519 | 26,388 | 29,823 | 29,823 | 19,519 | 26,388 | 338,533 | 70,291 | 78,269 | 26,388 | 338,523 | 29,823 |
| Commissions (External Agents) | 110,000 | - | - | - | - | - | - | - | - | - | - | - |
| Travel, Meals & Entertainment | - | 14,477 | 44,014 | 44,014 | - | 14,671 | - | 17,667 | - | 14,477 | 14,671 | 17,667 |
| Rent and Utilities | 8,098 | 6,024 | 17,667 | 17,667 | 8,098 | 6,024 | 17,667 | 17,667 | 8,098 | 6,024 | 17,667 | 17,667 |
| IRU/Inventory Maintenance | 3,370 | 47,287 | 386,552 | 7,352 | 3,370 | 46,038 | 7,352 | 7,352 | 3,370 | 46,038 | 67,352 | 56,182 |
| Other | 26,449 | - | 56,182 | 56,182 | 25,750 | 20,225 | 56,182 | 56,182 | 25,750 | - | 56,182 | - |
| Estimated Wind Down Costs | - | - | - | - | - | - | - | - | - | - | 27,575 | - |
| DIP Interest Costs/Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | 609,016 | 839,116 | 1,278,751 | 407,757 | 532,856 | 334,914 | 922,557 | 434,034 | 670,721 | 300,017 | 1,024,803 | 414,034 |
| **Net Cash Flows Before DIP Financing** | (481,131) | (468,704) | (991,542) | 79,606 | (337,974) | 101,006 | (328,539) | 187,359 | (194,568) | 103,079 | (409,577) | 96,471 |
| *Cumulative Net Cash Flows Before DIP Financing* | (481,131) | (949,834) | (1,941,376) | (1,861,770) | (2,199,744) | (2,098,738) | (2,427,277) | (2,239,919) | (2,434,486) | (2,331,407) | (2,740,984) | (2,644,513) |
| DIP Financing | 1,405,439 | 468,704 | 991,542 | - | 258,368 | - | 227,533 | - | 7,209 | - | 306,498 | - |
| Principal Payments | | | | | | | | | | | | |
| **Cash Flow from DIP Financing** | 1,405,439 | 468,704 | 991,542 | - | 258,368 | - | 227,533 | - | 7,209 | - | 306,498 | - |
| **Net Cash Flow** | 924,308 | - | - | 79,606 | (79,606) | 101,006 | (101,006) | 187,359 | (187,359) | 103,079 | (103,079) | 96,471 |
| Beginning Cash | 75,692 | 1,000,000 | 1,000,000 | 1,000,000 | 1,079,606 | 1,000,000 | 1,101,006 | 1,000,000 | 1,187,359 | 1,000,000 | 1,103,079 | 1,000,000 |
| Add: Net Cash Flow | 924,308 | - | - | 79,606 | (79,606) | 101,006 | (101,006) | 187,359 | (187,359) | 103,079 | (103,079) | 96,471 |
| **Ending Cash** | 1,000,000 | 1,000,000 | 1,000,000 | 1,079,606 | 1,000,000 | 1,101,006 | 1,000,000 | 1,187,359 | 1,000,000 | 1,103,079 | 1,000,000 | 1,096,471 |
| *Cumulative DIP Financing* | 1,405,439 | 1,874,142 | 2,865,684 | 2,865,684 | 3,124,052 | 3,124,052 | 3,351,585 | 3,351,585 | 3,358,794 | 3,358,794 | 3,665,292 | 3,665,292 |

Great Lakes Comnet and Comlink
Weekly Forecast Beginning With Week Ended January 29, 2016
DIP Budget

| Week #: | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended: | 4/22/16 | 4/29/16 | 5/6/16 | 5/13/16 | 5/20/16 | 5/27/16 | 6/3/16 | 6/10/16 | 6/17/16 | |
| **Cash Receipts** | | | | | | | | | | |
| Collections on Existing A/R and Forecasted Collections | 46,920 | 203,790 | 155,666 | 167,103 | - | - | - | - | - | 2,082,976 |
| CLC | 251,620 | 254,620 | 382,593 | 381,055 | - | - | - | - | - | 4,533,790 |
| Comlink | | | | | | | | | | 6,616,766 |
| Total A/R Receipts and Forecasted Collections | 298,540 | 458,410 | 538,260 | 548,158 | - | - | - | - | - | |
| Other Cash Receipts (CCTC) | 29,222 | 29,222 | 29,222 | 29,222 | | | | | | 467,552 |
| Total Cash Receipts | 327,762 | 487,632 | 567,482 | 577,380 | - | - | - | - | - | 7,084,318 |
| **Cash Disbursements** | | | | | | | | | | |
| Wages | 318,291 | | | | 318,291 | | 48,000 | | | 2,459,728 |
| Employer 401(k) Contribution | 9,315 | | | | 9,315 | | 1,440 | | | 68,686 |
| Employer Payroll Taxes | 23,753 | | | | 23,753 | | 3,672 | | | 212,429 |
| Health, LT Dis & WC Insurance | 88,047 | | | | | | | | | 352,188 |
| Circuit Lease Costs/Colocation Rent | 56,380 | | 123,011 | 123,011 | | | | | | 1,612,806 |
| Taxes | 3,403 | | 7,425 | 7,425 | | | | | | 635,197 |
| Repairs and Maintenance | 12,970 | | 28,298 | 28,298 | | | | | | 371,018 |
| Construction and Equipment | 23,077 | | 73,986 | 73,986 | | | | | | 1,332,255 |
| Professional Services | 19,519 | 73,388 | 348,523 | 954,323 | | | | | | 2,841,463 |
| Commissions (External Agents) | | | | | 70,291 | 70,500 | 251,200 | 131,200 | | 281,164 |
| Travel, Meals & Entertainment | 14,671 | | | | | | | | | 88,028 |
| Rent and Utilities | 8,098 | 14,477 | 17,667 | 17,667 | | | | | | 231,638 |
| IRU/Inventory Maintenance | 3,370 | 6,024 | 7,352 | 7,352 | | | | | | 535,388 |
| Other | 25,750 | 46,038 | 56,182 | 56,182 | | | | | | 738,556 |
| Estimated Wind Down Costs | | | | 200,000 | | | | | | 200,000 |
| DIP Interest Costs/Fees | | | | 31,894 | | | | | | 189,694 |
| Total Disbursements | 591,971 | 327,017 | 1,014,878 | 1,500,137 | 421,649 | 70,500 | 304,312 | 131,200 | - | 12,150,239 |
| **Net Cash Flows Before DIP Financing** | (264,209) | 160,615 | (467,396) | (922,757) | (421,649) | (70,500) | (304,312) | (131,200) | (5,065,921) | (5,065,921) |
| *Cumulative Net Cash Flows Before DIP Financing* | (2,908,721) | (2,748,107) | (3,215,503) | (4,138,259) | (4,559,909) | (4,630,409) | (4,934,721) | (5,065,921) | (5,065,921) | |
| DIP Financing | 167,737 | | 306,781 | 850,418 | 927,661 | 506,012 | 435,512 | 131,200 | | 4,990,229 |
| Principal Payments | | 1,000,000 | | | | | | | | |
| Cash Flow from DIP Financing | 167,737 | 1,000,000 | 306,781 | 850,418 | 927,661 | 506,012 | 435,512 | 131,200 | | 4,990,229 |
| **Net Cash Flow** | (96,471) | 160,615 | (160,615) | (72,339) | 506,012 | 435,512 | 131,200 | - | - | (75,692) |
| Beginning Cash | 1,096,471 | 1,000,000 | 1,160,615 | 1,000,000 | 927,661 | 506,012 | 435,512 | 131,200 | - | |
| Add: Net Cash Flow | (96,471) | 160,615 | (160,615) | (72,339) | 506,012 | 435,512 | 131,200 | (131,200) | - | |
| Ending Cash | 1,000,000 | 1,160,615 | 1,000,000 | 927,661 | 506,012 | 435,512 | 131,200 | - | - | |
| *Cumulative DIP Financing* | 3,833,029 | 3,833,029 | 4,139,810 | 4,990,229 | 4,990,229 | 4,990,229 | 4,990,229 | 4,990,229 | 4,990,229 | |

# *EXHIBIT B*

**Great Lakes Comnet and Comlink**
**Weekly Forecast Beginning With Week Ended January 29, 2016**
**DIP Budget**

| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended: | 1/29/16 | 2/5/16 | 2/12/16 | 2/19/16 | 2/26/16 | 3/4/16 | 3/11/16 | 3/18/16 | 3/25/16 | 4/1/16 | 4/8/16 | 4/15/16 |
| **Cash Receipts** | | | | | | | | | | | | |
| Collections on Existing A/R and Forecasted Collections | | | | | | | | | | | | |
| GLC | $ 12,984 | 198,326 | 123,497 | 19,026 | 48,146 | 173,403 | 154,880 | 148,436 | 189,834 | 119,479 | 212,258 | 109,228 |
| Comlink | 85,679 | 142,864 | 134,490 | 439,115 | 117,514 | 233,295 | 409,916 | 443,735 | 257,097 | 254,395 | 373,746 | 373,055 |
| Total A/R Receipts and Forecasted Collections | 98,663 | 341,190 | 257,987 | 458,141 | 165,660 | 406,697 | 564,795 | 592,171 | 446,931 | 373,874 | 586,004 | 481,283 |
| Other Cash Receipts (CCTC) | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 | 29,222 |
| Total Cash Receipts | 127,885 | 370,412 | 287,209 | 487,363 | 194,882 | 435,919 | 594,017 | 621,393 | 476,153 | 403,096 | 615,226 | 510,505 |
| **Cash Disbursements** | | | | | | | | | | | | |
| Wages | 202,900 | | 226,791 | | 246,791 | | 226,791 | | 318,291 | | 226,791 | |
| Employer 401(K) Contribution | 5,853 | | 6,570 | | 7,170 | | 6,570 | | 9,315 | | 6,570 | |
| Employer Payroll Taxes | 28,952 | | 32,356 | | 18,283 | | 16,753 | | 23,753 | | 16,753 | |
| Health, LT Dis & WC Insurance | 88,047 | | | | 88,047 | | | | 88,047 | | | |
| Circuit Lease Costs/Colocation Rent | 56,380 | | 123,011 | 123,011 | 56,380 | 100,800 | 123,011 | 123,011 | 56,380 | 100,800 | 123,011 | 123,011 |
| Taxes | 3,403 | | 7,425 | 7,425 | 3,403 | 6,084 | 7,425 | 7,425 | 3,403 | 6,084 | 7,425 | 7,425 |
| Repairs and Maintenance | 12,970 | | 28,298 | 28,298 | 12,970 | 23,189 | 28,298 | 28,298 | 12,970 | 23,189 | 28,298 | 28,298 |
| Construction and Equipment | 43,077 | | 293,986 | 93,986 | 43,077 | 77,016 | 93,986 | 93,986 | 43,077 | 77,016 | 93,986 | 73,986 |
| Professional Services | 19,519 | | 70,291 | 29,823 | 19,519 | 46,038 | 338,523 | 70,291 | 78,269 | 26,388 | 336,523 | 70,291 |
| Commissions (External Agents) | | | 29,823 | 44,014 | | 14,671 | | 29,823 | | | 44,014 | 29,823 |
| Travel, Meals & Entertainment | 8,098 | | 17,667 | 17,667 | 8,098 | 14,477 | 17,667 | 17,667 | 8,098 | 14,477 | 17,667 | 17,667 |
| Rent and Utilities | 3,370 | | 386,352 | 7,352 | 3,370 | 6,024 | 7,352 | 7,352 | 3,370 | 6,024 | 67,352 | 7,352 |
| IRU/Inventory Maintenance | 26,449 | | 56,182 | 56,182 | 25,750 | 46,038 | 56,182 | 56,182 | 25,750 | 46,038 | 56,182 | 56,182 |
| Other | 110,000 | | | | | | | | | | | |
| Estimated Wind Down Costs | | | | | | | | | | | | |
| DIP Interest Costs/Fees | | | | | | | | | | | | |
| Total Disbursements | 609,016 | 839,116 | 1,278,751 | 407,757 | 532,856 | 334,914 | 922,557 | 434,034 | 670,721 | 300,017 | 1,024,803 | 414,034 |
| **Net Cash Flows Before DIP Financing** | (481,131) | (468,704) | (991,542) | 79,606 | (337,974) | 101,006 | (328,539) | 187,359 | (194,568) | 103,079 | (409,577) | 96,471 |
| *Cumulative Net Cash Flows Before DIP Financing* | (481,131) | (949,834) | (1,941,376) | (1,861,770) | (2,199,744) | (2,098,738) | (2,427,277) | (2,239,919) | (2,434,486) | (2,331,407) | (2,740,984) | (2,644,513) |
| DIP Financing | 1,405,439 | 468,704 | 991,542 | | 258,368 | | 227,533 | | 7,209 | | 306,498 | |
| Principal Payments | | | | | | | | | | | | |
| Cash Flow from DIP Financing | 1,405,439 | 468,704 | 991,542 | | 258,368 | | 227,533 | | 7,209 | | 306,498 | |
| **Net Cash Flow** | 924,308 | | | 79,606 | (79,606) | 101,006 | (101,006) | 187,359 | (187,359) | 103,079 | (103,079) | 96,471 |
| Beginning Cash | 75,692 | 1,000,000 | 1,000,000 | 1,000,000 | 1,079,606 | 1,000,000 | 1,101,006 | 1,000,000 | 1,187,359 | 1,000,000 | 1,103,079 | 1,000,000 |
| Add: Net Cash Flow | 924,308 | | | 79,606 | (79,606) | 101,006 | (101,006) | 187,359 | (187,359) | 103,079 | (103,079) | 96,471 |
| **Ending Cash** | 1,000,000 | 1,000,000 | 1,000,000 | 1,079,606 | 1,000,000 | 1,101,006 | 1,000,000 | 1,187,359 | 1,000,000 | 1,103,079 | 1,000,000 | 1,096,471 |
| *Cumulative DIP Financing* | 1,405,439 | 1,874,142 | 2,865,684 | 2,865,684 | 3,124,052 | 3,124,052 | 3,351,585 | 3,351,585 | 3,358,794 | 3,358,794 | 3,665,292 | 3,665,292 |

Great Lakes Comnet and Comlink
Weekly Forecast Beginning With Week Ended January 29, 2016
DIP Budget

| Week #: | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Week Ended: | 4/22/16 | 4/29/16 | 5/6/16 | 5/13/16 | 5/20/16 | 5/27/16 | 6/3/16 | 6/10/16 | 6/17/16 | |
| **Cash Receipts** | | | | | | | | | | |
| Collections on Existing A/R and Forecasted Collections | | | | | | | | | | |
| GLC | $ 46,920 | $ 203,790 | $ 155,666 | $ 167,103 | $ - | $ - | $ - | $ - | $ - | $ 2,082,976 |
| Comlink | 251,620 | 254,620 | 382,593 | 381,055 | - | - | - | - | - | 4,533,790 |
| Total A/R Receipts and Forecasted Collections | 298,540 | 458,410 | 538,260 | 548,158 | - | - | - | - | - | 6,616,766 |
| Other Cash Receipts (CCTC) | 29,222 | 29,222 | 29,222 | 29,222 | - | - | - | - | - | 467,552 |
| Total Cash Receipts | 327,762 | 487,632 | 567,482 | 577,380 | - | - | - | - | - | 7,084,318 |
| **Cash Disbursements** | | | | | | | | | | |
| Wages | 318,291 | - | 326,791 | - | 318,291 | - | 48,000 | - | - | 2,459,728 |
| Employer 401(k) Contribution | 9,315 | - | 6,570 | - | 9,315 | - | 1,440 | - | - | 68,686 |
| Employer Payroll Taxes | 23,753 | - | 24,403 | - | 23,753 | - | 3,672 | - | - | 212,429 |
| Health, LT Dis & WC Insurance | 88,047 | - | - | - | - | - | - | - | - | 352,188 |
| Circuit Lease Costs/Colocation Rent | 56,380 | 100,800 | 123,011 | 123,011 | - | - | - | - | - | 1,612,806 |
| Taxes | 3,403 | 6,084 | 7,425 | 7,425 | - | - | - | - | - | 635,197 |
| Repairs and Maintenance | 12,970 | 23,189 | 28,298 | 28,298 | - | - | - | - | - | 371,018 |
| Construction and Equipment | 23,077 | 57,016 | 73,986 | 73,986 | - | - | 251,200 | 131,200 | - | 1,332,255 |
| Professional Services | 19,519 | 73,388 | 348,523 | 954,323 | - | 70,500 | - | - | - | 2,841,463 |
| Commissions (External Agents) | - | - | - | - | 70,291 | - | - | - | - | 281,164 |
| Travel, Meals & Entertainment | - | - | 14,671 | - | - | - | - | - | - | 88,028 |
| Rent and Utilities | 8,698 | 14,477 | 17,667 | 17,667 | - | - | - | - | - | 231,638 |
| IRU/Inventory Maintenance | 3,370 | 6,024 | 7,352 | 7,352 | - | - | - | - | - | 535,388 |
| Other | 25,750 | 46,038 | 56,182 | 56,182 | - | - | - | - | - | 738,556 |
| Estimated Wind Down Costs | - | - | - | 200,000 | - | - | - | - | - | 200,000 |
| DIP Interest Costs/Fees | - | - | - | 31,894 | - | - | - | - | - | 189,694 |
| Total Disbursements | 591,971 | 327,017 | 1,034,878 | 1,590,137 | 421,649 | 70,500 | 304,312 | 131,200 | - | 12,150,239 |
| Net Cash Flows Before DIP Financing | (264,209) | 160,615 | (467,396) | (932,757) | (421,649) | (70,500) | (304,312) | (131,200) | - | (5,065,921) |
| *Cumulative Net Cash Flows Before DIP Financing* | *(2,908,721)* | *(2,748,107)* | *(3,215,503)* | *(4,138,259)* | *(4,559,909)* | *(4,630,409)* | *(4,934,721)* | *(5,065,921)* | *(5,065,971)* | |
| DIP Financing | 167,737 | - | 306,781 | 850,418 | - | 506,012 | 435,512 | 131,200 | - | 4,990,229 |
| Principal Payments | - | - | - | - | - | - | - | - | - | - |
| Cash Flow from DIP Financing | 167,737 | - | 306,781 | 850,418 | - | 506,012 | 435,512 | 131,200 | - | 4,990,229 |
| Net Cash Flow | (96,471) | 160,615 | (160,615) | (72,339) | (421,649) | (70,500) | (304,312) | (131,200) | - | (75,692) |
| Beginning Cash | 1,096,471 | 1,000,000 | 1,160,615 | 1,000,000 | 927,661 | 506,012 | 435,512 | 131,200 | - | |
| Add: Net Cash Flow | (96,471) | 160,615 | (160,615) | (72,339) | (421,649) | (70,500) | (304,312) | (131,200) | - | |
| Ending Cash | 1,000,000 | 1,160,615 | 1,000,000 | 927,661 | 506,012 | 435,512 | 131,200 | - | - | |
| *Cumulative DIP Financing* | *3,833,029* | *3,833,029* | *4,139,810* | *4,990,229* | *4,990,229* | *4,990,229* | *4,990,229* | *4,990,229* | *4,990,229* | |