# *EXHIBIT 2*

Case:16-00292-jtg   Doc #:17-2   Filed: 01/25/16   Page 1 of 6

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | Chapter 11 |
| GREAT LAKES COMNET, INC. | Case No. 16-_____ |
| Debtor. | |
| In re: | Chapter 11 |
| COMLINK, L.L.C. | Case No. 16-_____ |
| Debtor. | |
| _____/ | Honorable _____ |

### DECLARATION OF JASON HILL IN SUPPORT OF DEBTOR-IN-POSSESSION FINANCING

I, Jason Hill, make this declaration under 28 U.S.C. §1746:

1. I am a Managing Director of Media Venture Partners, LLC ("MVP"). On September 25, 2015, MVP was engaged by the Debtors as the exclusive advisor for the Debtors in connection with their efforts to (a) obtain short-term or debtor-in-possession financing; and (b) explore strategic options for the Debtors, including seeking, arranging, negotiating and closing a sale of the Debtors equity or their property and assets. MVP is an investment bank and financial advisor that specializes in raising debt and equity capital, and the marketing and sale of businesses and assets, in the telecommunications industry. I am in charge of and responsible for the engagement on behalf of MVP.

2. I co-founded the telecom group at MVP and have advised on over 50 M&A and capital raising transactions for wireless service, tower and communications infrastructure companies. Before joining MVP, I worked as an associate at Amsterdam Pacific Securities,

1

where I was involved with a number of telecommunications and media transactions. Before joining Amsterdam, I was an analyst in the investment banking division of Goldman, Sachs & Co. where I executed a number of equity, debt and M&A transactions related to the electric utility and oil & gas industries. I received my B.S. in Finance and Economics from Boston College.

3. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration.

## Valuation

4. Since at least October, 2015, the Debtors have been actively marketing their businesses and assets with our assistance. In that regard, MVP contacted over 50 potential prospects, 42 of whom signed Non-Disclosure Agreements, and 35 of whom received Confidential Information Memoranda concerning the Debtors' business and assets. MVP held management presentations with 6 prospects, and 5 prospects participated in the stalking horse process by submitting initial indications of interest.

5. These marketing efforts have resulted in the Debtors' receipt of a stalking horse offer, in the form of a purchase and sale agreement, for the sale and purchase of substantially all of the assets of both Debtors at a purchase price, including the assumption of certain liabilities, estimated to be approximately $32,600,000. Given the timely, extensive, and thorough marketing efforts undertaken over at least the past three months and the fact that the assets to be

sold are essentially the same assets that serve as Prepetition Collateral, I believe that the value of the Prepetition Collateral is no less than $32,600,000, the approximate amount of the stalking horse purchase price, and may be greater if a "higher and better" going concern auction and sale can be conducted within a reasonable period of time.

## Efforts to Obtain Financing

6. In an attempt to obtain the most favorable financing for the Debtors practical under the circumstances, MVP contacted 30 financial parties (of the 50 prospective prospects that were initially contacted) capable of refinancing the Prepetition Debt, providing debtor-in-possession financing, or both. MVP received initial interest from at least 3 potential lending sources, but none of those potential lending sources would consider providing debtor-in-possession financing on any basis that did not include the grant of a section 364(d) lien senior to the lien of the Prepetition Senior Lender in the Prepetition Collateral. The Prepetition Senior Lender would not consent to the grant of a section 364(d) lien senior to its own lien.

7. In my opinion, the values of the Prepetition Collateral (based on the efforts and results described in paragraphs 4 and 5 above), and the cost and expense, time, and uncertainty of litigation make any non-consensual, priming debtor-in-possession financing impossible to achieve within a reasonable period of time.

8. As a result of the value of the Prepetition Collateral and the likely inability to provide adequate protection of the Prepetition Senior Lender's interest in the Prepetition Collateral without the consent of the Prepetition Senior Lender, the proposed financing is on the best terms under the circumstances.

9. I am of the view that the Debtors are unable to obtain the required financing in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense pursuant to section 364(a) or 364(b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code, secured debt as described in section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP Lender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: January 25, 2016

_____
Jason Hill